**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Stephen J. EIDE, Defendant–Appellant.**

**No. 88–3131.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 13, 1989.

Decided May 30, 1989.

Gardner W. Skinner, Jr., David Rupert Skinner, Cantrill, Skinner, Sullivan & King, Boise, Idaho, for defendant-appellant.

Ronald D. Howen, Joanne P. Rodriguez, Asst. U.S. Attys., Boise, Idaho, for plaintiff-appellee.

Before WRIGHT, TANG and WIGGINS, Circuit Judges.

TANG, Circuit Judge:

Stephen Eide appeals his convictions for various drug-related crimes on the grounds that the district court erroneously denied his Motion to Suppress. On appeal, Eide argues that statements he made to hospital personnel while being treated at a VA emergency room should be suppressed because he was not given his *"Miranda* rights" and because the statements were involuntary. Eide makes similar arguments with respect to statements he made to the FBI eleven days later. Finally, Eide argues that 42 U.S.C. § 290ee–3 requires the suppression of his urinalysis results and some statements he made at the hospital.

## I. *Factual Background*

### A. *Eide's Initial Contact With Police And Visit To Emergency Room*

The defendant, Stephen Eide, was employed as a pharmacist at the Veterans Administration Medical Center (VAMC) in Boise. On October 18, 1987, two Boise police officers, investigating a report that a man was injecting himself with a needle, found Eide in his car with needles, syringes, and drugs in his possession. After Eide informed the officers that he had injected himself with drugs, they radioed for an ambulance.

The police called Eide's supervisor at the VAMC, Jan Poreba, who soon arrived on the scene. The police gave Mr. Poreba the option of having Eide arrested or having the VAMC handle the matter internally. Poreba chose the latter option and took Eide to the VAMC Emergency Room where he was examined by Dr. Scott Smith, the physician on duty, and Lee Spidell, the resident nurse. According to Poreba, Eide's speech was slurred and he was rambling and incoherent.

At the VAMC, Eide consented to a urinalysis which later revealed the presence of methadone, morphine, and Darvon. Eide admitted to using Tylenol # 3, Halcion, Darvon, Tenuate, and methadone.

### B. *Promises To Eide Of Confidentiality*

Although Poreba informed Eide that "this would be kept confidential," Poreba later testified that this promise of confidentiality related only to Eide's treatment and not to the situation generally. Furthermore, no emergency room report was completed, though the reason for this is somewhat in dispute. The government claims that no report was made because Eide, as a non-veteran, was not eligible for care at the VAMC, while Eide claims that this was done in part "to ensure maximum confidentiality". In addition, the urinalysis was ordered in the name "John Doe" to keep the test confidential.

At some point after Poreba mentioned the issue of confidentiality, Eide began to recount his involvement with drugs, perhaps as part of the "history" taken by Dr. Smith during the treatment process. Dr. Smith testified that although Eide was disoriented, mildly confused, and obviously under the influence of drugs, he was not incoherent, he knew where he was, and could understand and respond to questions.

The following morning, on October 19, 1987, Eide met with Jim Sola, Chief of the VAMC Social Works Service, but was informed that he could not be treated at the VAMC because he was not a veteran, but was assured once again that the matter would be handled as discreetly as possible. Indeed, Eide was under the impression that the matter was being handled administratively and that no criminal action would be taken against him.

## C. *Involvement Of The FBI*

On October 26, 1987, a random bi-weekly audit at the VAMC pharmacy revealed some irregularities and a subsequent audit revealed that someone had tampered with methadone, morphine, and cocaine. David Nauge, the VAMC Chief of Security, was notified of the problem and called the FBI which assigned agents Grajewski and Kaminski to the case. The FBI agents were told by VAMC staff that Eide was a suspect and were given the results of Eide's urinalysis, a copy of an October 20th memorandum written by Poreba,[1] and copies of letters written by Dr. Smith and Lee Spidell.

On October 29, 1987, the FBI agents went to Eide's residence. The testimony as to what was said at this meeting is sharply in dispute. Eide testified that one of the agents told him that this was merely a VAMC internal matter and that they were there only to help out the VAMC security staff; Eide's wife corroborated this testimony. The FBI agents, however, denied this account.

All the witnesses agreed that the atmosphere of the meeting, which lasted approximately 90 minutes, was amicable. Eide was not given *Miranda* warnings. After the agents told Eide that they had the urinalysis results, Eide admitted to tampering with drugs. The admission may have been induced by one of the agents telling Eide a short "parable" to make Eide aware of the additional pain that patients may have suffered as a result of receiving diluted dosages of pain-killing narcotics. Eide signed a statement admitting to theft and tampering of drugs, but later testified that during the meeting with the FBI he was under extreme emotional distress. The FBI agents, though, testified that Eide understood their questions, was coherent, and appeared to be in no physical difficulty.

The following morning, on October 30, 1987, Eide called the FBI agents and made further admissions regarding morphine and cocaine. After returning from a hospital where his wife was being treated after suffering a miscarriage, Eide again met with the FBI agents at his residence. Agent Grajewski read Eide his *Miranda* rights and asked Eide to sign a form indicating waiver of these rights. Instead of signing this form, Eide stated that "I suppose I should get a lawyer." There was no further interrogation.

## II. *Procedural Background*

On November 20, 1987, a grand jury filed a superseding indictment[2] charging Eide with five drug counts as follows: (1) tampering with cocaine, in violation of 18 U.S. C. § 1365(a)(4);[3] (2) obtaining possession

---

**1.** This internal VA memorandum, which Eide sought to have suppressed, was written by Poreba to "Chief, Personnel Service." In this four-page typed memorandum, Poreba details his impressions of the encounter with Eide and the Boise police, discusses his impressions of Eide's physical and emotional condition, and outlines Eide's various admissions regarding illegal drug usage.

**2.** The original indictment was also filed on November 20, 1987. CR 24. The superceding indictment was apparently issued in order to add two additional charges: Counts Four and Five.

**3.** "Whoever, with reckless disregard for the risk that another person will be placed in danger of death or bodily injury and under circumstances manifesting extreme indifference to such risk, tampers with any consumer product that affects

of Halcion by fraud deception and subterfuge, in violation of 21 U.S.C. § 843(a)(3); [4] (3) obtaining Darvon by fraud, in violation of 21 U.S.C. § 843(a)(3); (4) tampering with methadone hydrochloride, in violation of 18 U.S.C. § 1365(a)(4); and (5) tampering with morphine, in violation of 18 U.S.C. § 1365(a)(4).

On January 4, 1988, Eide filed a Motion to Suppress Evidence, in which he sought to have the following suppressed: (1) the testimony of Poreba concerning Eide's admissions; (2) the October 20, 1987 memorandum written by Poreba; (3) the results of the urinalysis; (4) the testimony of the FBI agents concerning Eide's admissions on October 29 and October 30; and (5) the statement signed by Eide on October 29. After a hearing, the motion to suppress was denied on February 12, 1988.

On March 31, 1988, as a result of a plea bargain, Eide pleaded guilty to Counts Two and Five of the indictment, reserving his right to appeal the denial of the motion to suppress.[5] On June 3, 1988, Eide was sentenced to 60 days imprisonment and five years probation. On June 24, 1988, the district court stayed the execution of Eide's prison sentence and he is presently free on his own recognizance.

III. *Should Eide's Admissions At The VAMC Have Been Suppressed On The Grounds That They Were Obtained in Violation Of Miranda v. Arizona?*

A district court's findings on the question of whether a defendant is the focus of a custodial interrogation and thus entitled to the procedural safeguards outlined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is a factual determination to be made on a case-by-case basis. *United States v. Crisco,* 725 F.2d 1228, 1230 (9th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984).

Thus, the clearly erroneous standard applies. *United States v. Wauneka,* 770 F.2d 1434, 1438 (9th Cir.1985).

While at the VAMC emergency room, Eide made certain admissions to Poreba which are discussed in Eide's October 20 memorandum. ER 20. Eide argues that Poreba's testimony and the October 20 memorandum should be suppressed because Eide's admissions to Poreba were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The issue is whether *Miranda* even applies to the instant situation. Under *Miranda,* the *"Miranda* rights" must be given when a suspect is subjected to "custodial interrogation" which is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612.

On the other hand, "it is clear that *Miranda* does not govern interrogation by private citizens acting on their own." 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.10(b), p. 541 (1984). In ruling that *Miranda* was inapplicable to the instant situation, the district court relied on *United States v. Birnstihl,* 441 F.2d 368 (9th Cir. 1971), in which the failure of a private security guard to give *Miranda* warnings did not render the defendant's statements inadmissible:

> The evidence was completely inadequate from which to conclude that the guard in this case was an actual or ostensible agent of the police.

441 F.2d at 370. Eide, citing this same language from *Birnstihl,* argues that Poreba *was* acting as an ostensible agent of the police. In fact, Poreba was a federal

---

interstate or foreign commerce, or the labeling of, or container for, any such product, or attempts to do so, shall ... be fined not more than $50,000 or imprisoned not more than ten years, or both." 18 U.S.C. § 1365(a)(4).

**4.** It shall be unlawful for any person knowingly or intentionally "... to acquire or obtain possession of a controlled substance by misrepresenta-

tion, fraud, forgery, deception, or subterfuge." 21 U.S.C. § 843(a)(3).

**5.** Earlier, on February 19, 1988, Eide filed a Notice of Appeal from the denial of the suppression motion. We dismissed that appeal on March 4, 1988.

government employee of the VAMC and not really a "private citizen."

■ Nevertheless, "the courts have generally held that government agents not primarily charged with enforcement of the criminal law are under no obligation to comply with *Miranda.*" 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.10(c), p. 542 (1984). But there have been some narrow exceptions. In *United States v. Stevens,* 601 F.2d 1075, 1077 (9th Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979), the court ruled that "[u]nder certain circumstances private actors are transformed into government agents by virtue of their involvement in a federally regulated crime prevention program." Furthermore, in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Court ruled that a court-appointed psychiatrist must give *Miranda* warnings. The holding in *Estelle,* however, was later restricted by *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 2918–19, 97 L.Ed.2d 336 (1987), where the Court ruled that a court-appointed psychiatrist requested by the defense need not give the *Miranda* warnings.

Particularly because the Boise police had nothing to do with Eide after he left for the VAMC with Poreba, Poreba was not acting as an actual or ostensible agent of the police. The decision of the district court in refusing to suppress Poreba's evidence is thus not clearly erroneous.

### IV. *Should Eide's Admissions At The VAMC Be Suppressed On The Grounds That They Were Involuntary?*

A district court's determination that a confession is voluntary is reviewed de novo. *United States v. Wolf,* 813 F.2d 970, 974 (9th Cir.1987). In general, a district court's decision regarding the relevancy of evidence is reviewed for an abuse of discretion. *United States v. Burreson,* 643 F.2d 1344, 1349 (9th Cir.), *cert denied,* 454 U.S. 830, 102 S.Ct. 125, 70 L.Ed.2d 106 (1981). A court's balancing of the probative value

of the evidence against its prejudicial harm is also reviewed for an abuse of discretion. *United States v. Rubio,* 727 F.2d 786, 798 (9th Cir.1983).

Eide argues that the admissions he made at the VAMC on October 18, 1987 were involuntary and should be suppressed because he was under the influence of drugs at the time and because of the promises of confidentiality.

■ First, even if it were true that Eide was under the influence of drugs when making these statements, and even if his statements were elicited by false promises, voluntariness is not an issue when the admissions are made to private individuals. Indeed, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly,* 479 U.S., 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Because the police were not involved in any of the activities at the VAMC on October 18, 1987, Eide cannot prevail on a due process claim.

Thus, the admissibility of Eide's statements at the VAMC is merely an evidentiary ruling which we review for an abuse of discretion. We hold that the district court did not abuse its discretion in ruling the statements to be admissible.

### V. *Is Suppression Of Eide's Admissions And Medical Records At The VAMC Required By 42 U.S.C. § 290ee–3 Or By Regulations?*

Interpretation of a statute is a question of law that is subject to de novo review. *Trustees of Amalgamated Ins. Fund v. Geltman Indus.,* 784 F.2d 926, 929 (9th Cir.), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986). On the other hand, a district court's findings of fact must be accepted unless clearly erroneous. *Johnson v. United States Postal Serv.,* 756 F.2d 1461, 1464 (9th Cir.1985).

Eide argues that statements that he made at the VAMC and results of his urinalysis should be suppressed on the authority of 42 U.S.C. § 290ee–3(a) [6]:

---

**6.** The prohibitions of 42 U.S.C. § 290ee–3(a) do not apply "to any interchange of records within

the Armed Forces or within those components of the Veteran's Administration furnishing

*Records* of the identity, diagnosis, prognosis, or treatment of any *patient* which are maintained in connection with the performance of any *drug abuse prevention function* conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall ... be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b) of this section. (emphasis added).

Except as authorized by court order, no record referred to in § 290ee–3(a) "may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient." 42 U.S.C. § 290ee–3(c).

The district court ruled that 42 U.S.C. § 290ee–3 does not compel suppression because (1) "Eide did not qualify to become a VAMC patient because he was not a veteran"; (2) "[a]ny treatment Eide received [at the VAMC] was not for drug abuse prevention but was instead to determine whether he needed immediate medical care and whether he was suicidal"; and (3) Eide's statements at the VAMC, as well as the urinalysis, were given within an administrative, not a medical, context of the hospital.

### A. *Meaning of "Patient"*

The first threshold question is whether Eide was a "patient" within the meaning of 42 U.S.C. § 290ee–3. The pertinent regulations define "patient" as

"any individual who has *applied for* or *been given diagnosis* or *treatement* for alcohol or *drug abuse* ..."

42 C.F.R. § 2.11, ¶ 6 (1988). (emphasis added).

The issue, then, is whether Eide was given "diagnosis" or "treatment" for "drug abuse." "Diagnosis"

means *any* reference to an individual's alcohol or drug abuse or to a condition which is identified as having caused by that abuse which is made for the purpose of treatment or referral for treatment.

42 C.F.R. § 2.11, ¶ 3 (1988) (emphasis added). "Treatment"

means the management and care of a patient suffering from alcohol or drug abuse, a condition which is identified as having been caused by that abuse, or both, in order to reduce or eliminate the adverse effects upon the patient.

42 C.F.R. § 2.11, ¶ 14 (1988). Finally, the regulations define "drug abuse" as

the use of a psychoactive substance for other than medicinal purposes which impairs the physical, mental, emotional, or social well-being of the user.

42 C.F.R. § 2.11, ¶ 2 (1988).

After Eide informed the police that he had injected himself with drugs, Eide was taken to the VAMC emergency room. There can be no doubt that what immediately prompted Eide to be taken to the emergency room was his "drug abuse." Indeed, in being taken to the VAMC, Eide was suspected of "the use of a psychoactive substance for other than medicinal purposes which impairs the physical, mental, emotional, or social well-being of the user." If Eide were suicidal, his drug abuse was no doubt a contributing factor.

▮▮▮ Thus, upon arriving at the VAMC, it is apparent that Eide "had applied for" diagnosis or treatment for his drug abuse. Even if Eide did not make a formal "application" for diagnosis or treatment, Eide was certainly "given" diagnosis. Considering the definition of "diagnosis" in the regulations, the staff at the VAMC certainly made "any reference" to Eide's drug abuse for the purpose of treatment or referral. Indeed, Eide was given a referral to the Chief of the VAMC Social Work Service.[7]

---

health care to veterans." 42 § 290ee–3(e)(1). For veterans, the confidentiality of records is governed by 38 U.S.C. § 4132 and the regulations promulgated by the Administrator of Veteran's Affairs. 42 C.F.R. § 2.12(c)(1) (1988). But since Eide is not a veteran, he should be

covered under 42 U.S.C. § 290ee–3(a) and the accompanying regulations.

**7.** In addition, although an individual qualifies as being a "patient" by being given either "diagnosis" *or* "treatment," Eide, as "a patient suffering from drug abuse," was given "management

We reverse the district court and conclude that Eide was a "patient" within the meaning of 42 U.S.C. § 290ee–3.

## B. *Meaning of "Records"*

The second threshold question is whether the urinalysis results and the statements Eide made at the VAMC that Eide's seeks suppressed constitute "records" within the meaning of the 42 U.S.C. § 290ee–3(a). "Records" means

> any information, whether recorded or not, relating to a patient received or acquired by a federally assisted alcohol or drug program.

42 C.F.R. § 2.11, ¶ 12 (1988).

■ Considering this broad definition, we conclude that the statements and urinalysis results are "records" within the meaning of 42 U.S.C. § 290ee–3(a).

## C. *Meaning of "Federally Assisted Drug Abuse Program"*

According to the regulations, the confidentiality requirements of 42 U.S.C. § 290ee–3(a) apply to records "which are maintained in connection with the performance of any federally assisted alcohol and drug abuse program." 42 C.F.R. § 2.3(a) (1988). The issue, then, is whether the VAMC where Eide received treatment is a "federally assisted alcohol and drug abuse program" within the meaning of the statute. Again, we turn for guidance to the regulations:

> Program means a *person* which in whole or in part holds itself out as providing, and provides, alcohol or drug abuse diagnosis, treatment, or referral for treatment. For a general care facility or any part thereof to be a program, it must have:

> (a) An identified unit which provides alcohol or drug diagnosis, treatment, or referral for treatment *or*

> (b) Medical personnel or other staff whose primary function is the provision of alcohol or drug abuse diagnosis, treatment, or referral for treatment and who are identified as such providers.

42 C.F.R. § 2.11, ¶ 9 (1988) (emphasis added).

■ The emergency room at the VAMC undoubtedly is a "person" [8] which "in part" "holds itself out as providing, and provides, ... drug abuse diagnosis, treatment, or referral for treatment." In fact, Eide received such services there. A hospital emergency room, while obviously also performing functions unrelated to drug abuse, serves as a vital first link in drug abuse diagnosis, treatment, and referral. Indeed, it is apparent that many drug abusers are first diagnosed as having a drug abuse problem, and are first given treatment or a referral for their drug abuse, at a hospital emergency room in conjunction with a suspected drug overdose.[9]

## D. *Conclusions*

The legislative history of this statutory scheme indicates that Congress intended to deal with "this tragic national problem" in facilitating the work of drug and alcohol treatment centers by assuring the confidentiality of its patients. 1972 U.S.Code & Admin.News 2045, 2072. The rationale behind 42 U.S.C. § 290ee–3(a) is to encourage people with drug or alcohol problems to seek treatment. Eide became a patient at the VAMC because of his drug problems and he received medical care for these problems.

---

and care" in order to eliminate the adverse effects upon him. Even though the VAMC staff may have also been considering non-medical factors, the district court's statement that "[t]he urinalysis was an administrative, *not* a medical requirement," *Memorandum,* ER 22 at 15 (emphasis added), is clearly erroneous.

**8.** As the term is used in 42 C.F.R. § 2.11, ¶ 9 (1988), "person" can mean an individual, an agency, or any other government entity. 42 C.F.R. § 2.11, ¶ 8 (1988).

**9.** Because Eide did not commit a crime on the premises of the emergency room, the exception to the confidentiality protections for "crimes on program premises" is inapplicable. 42 C.F.R. § 2.12(c)(5)(i) (1988). Furthermore, the implications of the dissent notwithstanding, the statements that Eide made at the emergency room and the results of his urinalysis are not "directly related" to the crimes of which Eide was convicted.

■ Allowing Eide's admissions and medical records to be admitted in a criminal prosecution contradicts the literal meaning of 42 U.S.C. § 290ee–3 as well as the Congressional intent underlying the statute. A contrary ruling would discourage people from seeking professional help for their alcohol and drug problems and would frustrate the work of alcohol and drug treatment facilities. The district court erred in refusing to suppress this evidence.

## VI. Should Eide's Admissions To The FBI Have Been Suppressed On The Grounds That They Were Obtained In Violation Of Miranda v. Arizona?

Eide contends that the FBI agents who interviewed him at his residence were required to give him *Miranda* warnings. But the fact that Eide may have been the "focus" of the FBI's investigation does not mandate the giving of *Miranda* warnings unless the suspect is in custody. *Beckwith v. United States*, 425 U.S. 341, 345–46, 96 S.Ct. 1612, 1615–16, 48 L.Ed.2d 1 (1976). Indeed,

> [t]he procedural protections afforded by *Miranda v. Arizona* are designed to secure an accused's privilege against self-incrimination and are triggered only in the event of a custodial interrogation. A defendant is in custody when, based upon a review of all the pertinent facts, "a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave."

*United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir.1985) (citations omitted). Furthermore, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the

degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

■ Eide was not in custody and in fact was never arrested for these crimes. This issue thus turns on whether reasonable innocent people in Eide's situation would conclude that they would not be free to leave after brief questioning. Particularly because the FBI agents interviewed Eide at his home, and also because the meeting was amicable, the district court's conclusion that *Miranda* warnings were not required are affirmed.[10]

## VII. Should Eide's Admissions To The FBI Have Been Suppressed On The Grounds That They Were Involuntary?

Finally, Eide argues that the statements he made to the FBI were involuntary because of implied promises the FBI agent made. Specifically, Eide argues that his confession was not voluntary because agents led him to believe that his statements would not be used against him in a criminal prosecution and because a "parable" that the agents told him induced the confession.

■ First, with respect to the parable, the district court ruled that while the use of the "parable" clearly touched sympathetic chords in Eide, it did not psychologically coerce him or overbear his will. This reasoning is sound.

■ Second, regarding the question of whether Eide confessed to the FBI because of implied promises by the agents, the district court found as a matter of fact that the FBI agents did *not* mention that they were merely assisting in a VA internal matter and that they did not make any misrepresentations or implied promises of immunity from prosecution or even of le-

---

10. Eide further argues that his admissions to the FBI on October 29, 1987 should be suppressed as fruit of the statements he made at the VAMC on October 18, 1987. But since the October 18 statements were not obtained illegally, this argument has no merit. Even if the October 18 statements were found to be inadmissible, the confession given to the FBI was sufficiently free from any taint to avoid suppression under the "fruit of the poisonous tree" doctrine, particularly because of the passage of eleven days. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

niency. Particularly since there was conflicting testimony on these points, we defer to the district court's findings of fact.

In order to be voluntary, a confession must be the product of a rational intellect and a free will, not coerced by physical intimidation or psychological pressure. *United States v. Tingle,* 658 F.2d 1332, 1335 (9th Cir.1981). Accepting the district court's factual findings, we hold that Eide's statements to the FBI were voluntary, and therefore the district court's refusal to suppress was not error.

## VIII. *Conclusion*

We affirm the rulings of the district court in all respects save and except as to its refusal to suppress evidence obtained in violation of 42 U.S.C. § 290ee-3. As to that, we remand for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART

EUGENE A. WRIGHT, Circuit Judge, dissenting:

In Part V of the opinion, the majority concludes that the district court should have suppressed Eide's admissions and medical records under 42 U.S.C. § 290ee-3. It concludes that he was a "patient" at the V.A. Medical Center. Yet, the district court found that the VAMC declined to make an emergency room report and later refused to treat Eide because he was not a veteran.

The opinion decides also that Eide "applied for" drug abuse diagnosis or treatment, although he was given only the option of going to the VAMC with Poreba, his supervisor, or being arrested.

The opinion determines that Eide received "treatment" although he received only a urinalysis and the district court found the purpose to be administrative, not medical.

Finally, the majority dismisses an exception to the statute for a crime committed on the program premises. I dissent from this part of the opinion because I believe the district court's factual findings are not clearly erroneous and the majority has misapplied the regulations.

## I. *Patient*

I agree that Eide's ability to suppress his VAMC statements and his urinalysis turns on 42 U.S.C. § 290ee-3(a) and the associated regulations. I agree also that we must look to the applicable regulations to interpret the statute. *See United States v. Corona,* 849 F.2d 562, 565 n. 5 (11th Cir. 1988), *cert. denied,* — U.S. —, 109 S.Ct. 1542, 103 L.Ed.2d 846 (1989). I part with my colleagues in their application of the regulations to the facts. I do not believe Eide qualifies as a "patient."

> Under the regulations, "patient" means: any individual who has *applied for* or *been given diagnosis* or *treatment* for alcohol or drug abuse. . . .

42 C.F.R. § 2.11, ¶ 6 (1988) (emphasis added). This definition requires considering the definitions of "diagnosis" and "treatment." "Diagnosis" means:

> any reference to an individual's alcohol or drug abuse or to a condition which is identified as having been caused by that abuse *which is made for the purpose of treatment or referral for treatment.*

42 C.F.R. § 2.11, ¶ 3 (1988) (emphasis added). Under this definition, determining whether a diagnosis has occurred requires referral to the definition of "treatment." "Treatment" is:

> the *management and care* of a patient suffering from alcohol or drug abuse, a condition which is identified as having been caused by that abuse, or both, *in order to reduce or eliminate the adverse effects upon the patient.*

42 C.F.R. § 2.11, ¶ 14 (1988) (emphasis added).

First, the court states that upon arriving at the VAMC, Eide "applied for" diagnosis or treatment for his drug abuse. Here, the majority misconstrues the facts.[1]

---

1. Because I conclude that Eide had not been given "diagnosis" or "treatment," whether he

"applied for" it does not matter. However, I

After the police discovered Eide with drugs in his possession, they called his supervisor, Poreba. Poreba had the option of having Eide arrested or having the VAMC handle the matter internally. He chose the latter option and took Eide to the emergency room for observation. The majority stretches these facts by concluding that Eide "applied for" diagnosis or treatment.

Second, the majority states that Eide received "diagnosis" or "treatment." To give "treatment," the emergency room must have provided management *and* care *in order to reduce or eliminate the adverse effects* of drug abuse upon Eide. As noted already, the police called Poreba who took Eide to the hospital. There, Dr. Smith took statements from Eide and gave him a urinalysis to test his truthfulness about his drug use.

The opinion fails to state how this qualifies as care in order to eliminate the adverse effects upon Eide. In fact, Dr. Smith knew the VAMC could not treat Eide.[2] The district court found specifically that the purpose of the urinalysis was administrative, not medical. The majority does not point to any evidence supporting its conclusion that this finding is clearly erroneous.[3]

Regarding "diagnosis," the majority opinion concludes that staff at the VAMC made "reference" to Eide's drug abuse "for the purpose of treatment or referral." The majority states that Eide was referred to the Chief of the VAMC Social Work Service. This was not a referral for treatment. Because Poreba and Spidell, the resident nurse, did not know what to do about Eide, they called Sola, the Chief of the VAMC Social Work Service, for advice. The next morning Sola told Eide the VAMC could not treat him.

I would conclude that Eide was not a "patient" within the meaning of § 290ee–3.

## II. *Federally Assisted Drug Abuse Program*

Assuming Eide was a "patient," I do not agree that the VAMC emergency room qualifies as a "federally assisted drug abuse program." Again, the majority misconstrues the regulations.

Under the regulations, "program" means:

> a person which in whole or in part holds itself out as providing, and provides, alcohol or drug abuse diagnosis, treatment, or referral for treatment. For a general care facility or *any part thereof to be a program, it must have:*
>
> (a) *An identified unit* which provides alcohol or drug diagnosis, treatment, or referral for treatment *or*
>
> (b) *Medical personnel or other staff whose primary function* is the provision of alcohol or drug abuse diagnosis, treatment, or referral for treatment *and who are identified as such providers.*

42 C.F.R. § 2.11, ¶ 9 (1988) (emphasis added). The majority's application of this regulation focuses upon the first sentence. It ignores the second sentence which qualifies the first and provides requirements for "a general care facility or any part thereof." The emergency room of the VAMC qualifies as a part of a general care facility and must meet the requirements of the regulation. Nothing in the record indicates that it has an identified unit or identified staff who primarily provide drug abuse diagnosis, treatment, or referral for treatment.

Alternatively, the emergency room might qualify under 42 C.F.R. § 2.11 ¶ 9 if the VAMC is a "federally assisted drug abuse program." Although I question this based on the terms of the regulation, an exception to § 290ee–3 would then apply under 42 C.F.R. § 2.12(c)(5) because Eide committed a crime on the premises by tampering

---

disagree strongly with the majority's characterization of the events.

**2.** The district court found that Dr. Smith did not make an emergency room report because Eide was not a veteran. The majority states that this was in dispute but does not indicate that the finding is clearly erroneous.

**3.** The district court also found that the VAMC did not give drug abuse treatment, but determined if Eide was suicidal. The majority states that "[i]f Eide was suicidal, his drug abuse was ... a contributing factor." Nothing in the record supports this.

with the pharmacy's methadone, morphine, and cocaine. *See* III. *Crime on Program Premises, infra.*

The definition of "program" makes it clear that the statute is directed only toward *bona fide programs* with resources *dedicated* to fighting drug abuse. The statute speaks of "Records ... maintained in connection with the performance of any *drug abuse prevention function* ...." 42 U.S.C. § 290ee–3(a) (1982). The majority ignores the intention of Congress by applying the regulation to an ad hoc administrative examination occurring in an emergency room.

The opinion reasons that the emergency room provides the hospital's vital first link in drug abuse diagnosis and treatment. Besides ignoring the statute's intention and the literal terms of the regulations, the majority's rationale does not make sense in this situation. Here, the staff could not refer Eide to treatment at the VAMC because he was not a veteran.

The criteria a court must use to decide whether to authorize disclosure also support the conclusion that the statute does not apply. A court must weigh the public interest and need for the disclosure against the potential injury to the patient, to the physician-patient relationship, and to the ability of the program to provide services to other patients. *See, e.g., United States v. Corona,* 849 F.2d at 565; 42 C.F.R. § 2.65(d)(4) (1988). Here, disclosure would provide no injury to the physician-patient relationship or to the ability of the emergency room to provide services to other patients. Eide had no such relationship and the emergency room is not a drug abuse treatment program. Eide met Dr. Smith when he came to the emergency room. As stated earlier, Dr. Smith merely took his statements and gave him a urinalysis. This demonstrates that the statute should not apply.

Finally, the majority opinion indicates that the statute seeks to encourage persons with drug or alcohol problems to seek treatment. As a general statement, this rationale may have merit. However, it does not make sense in this context. Eide did not find the emergency room on his own. Poreba took him there. *Cf.* 42 C.F.R. § 2.3(b)(2) (1988) ("[These regulations] are intended to insure that an alcohol or drug abuse patient in a federally assisted alcohol or drug abuse program is not made more vulnerable by reason of the availability of his or her patient record than an individual who has an alcohol or drug problem and who does not seek treatment.")

## III. *Crime on Program Premises*

Assuming Eide falls within the terms of § 290ee–3, its protections are not absolute. *See, e.g., United States v. Hornick,* 815 F.2d 1156, 1159 (7th Cir.1987). The majority misapplies the exceptions provided by the regulations. 42 C.F.R. § 2.12(c)(5) (1988) states:

> The restrictions on disclosure and use in these regulations *do not apply* to communications from program personnel to law enforcement officers which
>
> (i) Are *directly related* to a patient's *commission of a crime on the premises of the program* ...; and
>
> (ii) Are limited to the circumstances of the incident, .... (emphasis added).

If Eide were a "patient" and the VAMC is a "federally assisted drug abuse program," he comes within this exception. A VAMC audit revealing tampering with methadone, morphine, and cocaine prompted the FBI investigation leading to the criminal charges. The records at issue were directly related to Eide's commission of these crimes.

In footnote 9, the opinion states that this regulation does not apply because "Eide did not commit a crime on the premises of the emergency room." Yet, in text preceding the footnote the majority states the issue as "whether the VAMC where Eide received treatment is a 'federally assisted alcohol and drug abuse program.'" It also concludes that the hospital emergency room is the "vital first link in drug abuse diagnosis, treatment and referral." It nonetheless fails to apply the regulation to determine whether this "part" of a general care facility qualifies as a "program."

The majority refuses to acknowledge that *either* the VAMC *or* the emergency room is the "program," not both. If the emergency room is the program, then it fails under the second sentence of the definition of "program." If the VAMC is the program, then the exception to 42 C.F.R. § 2.12(c)(5) applies. The majority errs by not coming to terms with this inconsistent application of the regulations.

I would affirm the judgment of the district court. The statute does not apply because Eide was not a patient and because the emergency room is not a federally assisted drug abuse program. Even assuming the VAMC is such a program under the regulations, the evidence directly relates to a crime that occurred on the premises, satisfying an exception to the statute.

