85 F.3d 638
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Maynard Charles CAMPBELL, Defendant-Appellant.
 No. 94-30295.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 10, 1995.
Decided May 9, 1996.
 
 1
 Before: HUG, Chief Judge, GOODWIN, Circuit Judge, and SCHWARZER, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 Maynard C. Campbell appeals his convictions under 18 U.S.C. § 115(a)(1)(A) & (B) (1988) for threatening to assault and murder a federal law enforcement officer, a United States judge, a member of the judge's immediate family, and an Assistant United States Attorney; and for using a firearm during the offense charged in violation of 18 U.S.C. § 924(c)(1) (1988 & Supp. IV 1992). We have jurisdiction under 28 U.S.C. § 1291 and affirm.
 
 FACTS
 
 4
 The material facts are undisputed. On October 9, 1992, Maynard Campbell and Eileen Kunkel were indicted for theft of government timber. Agents obtained an arrest warrant for Campbell and a summons for Kunkel. Unaware that Campbell would be present at Kunkel's residence, agents first served Kunkel's summons. Campbell read Kunkel's summons and the attached indictment also naming him as a defendant, at which point he became angry and threatened that if the agents "mess with me," "something similar will happen like what happened in Idaho" where "Randy Weaver [shot] deputy marshals." As agents were leaving the home, Campbell reached behind his back for what the officers thought (and what Campbell later admitted) was a handgun.
 
 
 5
 Agents later returned with the warrant and attempted to phone Campbell to ask him to come outside, surrender, and avoid violence. Unable to reach Campbell because his phone was busy, the agents remained outside his house. A 15-hour standoff resulted, during which Campbell talked to Medford Detective Mike Blair who, unaware of the current situation, phoned Campbell at the suggestion of a mutual friend. Believing the agents were going to kill him because of the books he had written, Campbell told Blair that he was heavily armed with an AR-15 and several semiautomatic pistols loaded with tracer rounds and armor-piercing bullets. Campbell said that his plan was to talk with his attorney and then leave the house peacefully, and that if officers attempted to arrest him, he was prepared to resist. Campbell never attempted to leave the house and no shots were ever fired. In another phone conversation with an unknown male during the standoff, Campbell made similar statements and said:
 
 
 6
 [M]y statement to everybody is, is that I want these communist bastards killed. All of them. Their wives, their kids. They destroy us. They are not going to stop ... or we can kill them. My position is to kill them, and I will do it by example. I'll do the best job I can. I'm sitting here with uh three .45's on, and an AR-15 in my arms, with uh, uh, unique ammo in it.
 
 
 7
 During the standoff, Deputy U.S. Marshal Mark Barr and the other officers received numerous reports regarding Campbell's intentions and the firearms and explosives that were on the premises. In particular, Detective Blair informed them of his conversation with Campbell and told them about booklets that Campbell had written on booby traps, the use of ricin poisons which could be absorbed through the skin, and his threat in a book that the next time he is stopped by a police officer, he plans to "put[ ] a bullet between his eyes." In addition, Barr received reports from two Campbell sympathizers that there was "a good possibility there was dynamite at the house." One of the sympathizers, Kathy Pabst, said that there may also have been one to three 55-gallon tanks of gasoline on the premises.
 
 
 8
 With the assistance of a negotiating team, Campbell was eventually persuaded to surrender and was arrested. After his arrest, they searched his house twice. The local Special Emergency Response Team (S.E.R.T.) conducted an initial three-minute sweep for additional persons or "booby traps" and found nothing. About two minutes later, Barr, Ashland Police Lieutenant Mel Clements, and Department of Agriculture Agent Neal Hashieder, searched the house for explosives. While Barr did not find any explosives, he did find and seize a number of weapons and ammunition. Both searches came after Barr's supervisor, Deputy U.S. Marshal Brian Leavitt, had made at least three unsuccessful attempts to contact a federal magistrate or judge to obtain a search warrant.
 
 
 9
 Campbell was charged with six counts of threatening federal law enforcement officers, a judge, a family member of a judge, and an assistant U.S. attorney with intent to impede them in the fulfillment of their duties in violation of 18 U.S.C. § 115(a)(1)(A) & (B) and of using a weapon in the commission of a violent crime in violation of 18 U.S.C. § 924(c)(1). Campbell was convicted on all six counts, but was granted a new trial following an erroneous jury instruction. At the second trial, Campbell was convicted on counts 3 through 6. He appeals that conviction.
 
 DISCUSSION
 I. INVALID SEARCH AND SEIZURE
 
 10
 Campbell argues that his Fourth Amendment rights were violated when, following his surrender, federal agents searched his home and seized numerous firearms. Campbell challenges both S.E.R.T.'s protective sweep for additional persons and booby traps and Barr's subsequent search for explosives.
 
 
 11
 We review the district court's findings of fact for clear error. The existence of probable cause and exigent circumstances are reviewable de novo. United States v. Suarez, 902 F.2d 1466, 1467 (9th Cir.1990).
 
 A. S.E.R.T.'s Search
 
 12
 S.E.R.T. entered Campbell's residence immediately after his surrender to search for other persons and booby traps on the premises. While the district court found that the team had probable cause to believe others may have been on the premises, " '[e]ven the existence of probable cause, without more, does not validate a warrantless entry into a residence.' " See id. at 1467 (quoting United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1298 (9th Cir.1988)). "The government bears the additional burden of showing the existence of exigent circumstances by particularized evidence in order to justify a departure from the normal procedure of obtaining a warrant." Id. at 1468. This court has held that:
 
 
 13
 Exigent circumstances are those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers and other persons, the destruction of relevant evidence ... or some other consequence improperly frustrating legitimate law enforcement efforts. Included within this definition is the need to protect or preserve life or avoid serious injury.
 
 
 14
 United States v. Echegoyen, 799 F.2d 1271, 1278 (9th Cir.1986) (citations and internal quotations omitted). To justify a protective search, the government must show more than its subjective belief that danger exists and "point to 'specific and articulable facts supporting their belief that other dangerous persons may be in the building or elsewhere on the premises.' " Suarez, 902 F.2d at 1468 (quoting United States v. Whitten, 706 F.2d 1000, 1014 (9th Cir.1983), cert. denied, 465 U.S. 1100 (1984)); see also United States v. Al-Azzawy, 784 F.2d 890, 895 (9th Cir.1985), cert. denied, 476 U.S. 1144 (1986) (finding exigent circumstances justified a warrantless search of a trailer where "police reasonably believed that the trailer contained explosives and that they were not able to arrest all of the persons entitled to enter the trailer").
 
 
 15
 Here, S.E.R.T.'s entry followed a 15-hour standoff, during which Campbell had been in continuous radio and telephonic contact with friends and supporters. At least one supporter was arrested trying to pass the police marker to go to Campbell's house. During the standoff, agents were informed that Campbell--whose Silent Tools of Justice detailed ways of using poisons and explosives to retaliate against government agents--had on the premises numerous weapons, armor piercing bullets, and explosives. Given the presence of persons trying to enter the home and the fact that Campbell had the knowledge, the material, and the time to construct booby traps while in the house, exigent circumstances existed justifying the warrantless protective sweep.
 
 B. Deputy Marshal Barr's Search
 
 16
 After S.E.R.T. completed its three minute sweep, Detective Barr asked the team if they had found any evidence of dynamite, to which S.E.R.T. answered they had not searched for explosives. During the standoff, agents had communicated with two independent sources who reported that Campbell had dynamite and one to three 55-gallon drums of gasoline on the premises. Although Barr had contacted the Oregon State Police Explosive Ordinance Disposal unit, it was not scheduled to arrive for another four hours. Barr therefore searched the residence "[d]ue to the continued possibility of explosives and the reality of harm to officers and civilians returning to their homes."
 
 
 17
 In the course of the search, while Barr found no dynamite, he discovered numerous loaded weapons, including two .45 caliber semiautomatic pistols and an AR-15 semiautomatic assault rifle with three magazines taped end to end in combat fashion. He seized the weapons for "safekeeping," "because we feared that one of Campbell's associates might gain access to the residence and take the weapons or that Eileen Kunkel would return" and her status as a felony suspect made it illegal for her to possess firearms. When Kunkel later arrived on the scene, he issued a receipt for the weapons to Kunkel. Challenging the legality of the search and seizure, Campbell contends that the evidence of weapons should have been suppressed.
 
 
 18
 Barr's search of the residence was justified by exigent circumstances in that it was necessary to prevent both "physical harm to the officers and other persons" and "the destruction of relevant evidence." See Echegoyen, 799 F.2d at 1278. The likely presence of dynamite and booby traps on the premises and the need to prevent destruction of evidence such as firearms by Campbell's sympathizers (including Kunkel) posed a dangerous situation requiring prompt action. See United States v. Lindsey, 877 F.2d 777, 781 (9th Cir.1989) ("Exigent circumstances are frequently found when dangerous explosives are involved.") (citations omitted). Moreover, as the trial judge found, the officers had made at least three good faith but unsuccessful efforts to contact a judge earlier in the evening to obtain a warrant. Given these facts, we decline to find that the search was illegal.
 
 II. MIRANDA VIOLATION
 
 19
 Campbell argues that his statements by telephone to Detective Blair should be suppressed because they were given without Miranda warnings when he was barricaded in his home. The district court found that because Campbell was not in custody when the statements were made, no Miranda warnings were required.
 
 
 20
 We review de novo a denial of a motion to suppress. People of the Territory of Guam v. Palomo, 35 F.3d 368, 375 (9th Cir.1994), cert. denied, 115 S.Ct. 750 (1995). We review for clear error the district court's factual findings as to whether a defendant was "in custody" for purposes of Miranda. Id. When, as here, the district court did not make factual findings, " '[we] will uphold the denial of the motion to suppress if there is a reasonable view of the evidence that will sustain it.' " Palomo, 35 F.3d at 375 (quoting United States v. Rabe, 848 F.2d 994, 997 (9th Cir.1988).
 
 
 21
 " 'Miranda rights' must be given when a suspect is subjected to 'custodial interrogation' which is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action....' " United States v. Eide, 875 F.2d 1429, 1433 (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). We use an objective standard to determine the issue of custody, asking "whether a reasonable person in the interviewee's position would consider himself or herself free to leave." Palomo, 35 F.3d at 375.
 
 
 22
 Campbell argues that because his home was surrounded by 70 law enforcement officers, he was not free to leave and was therefore "in custody" under Miranda. But the customary articulation of the test governing the application of Miranda assumes that law enforcement personnel have acted to restrain the defendant's freedom. By contrast, here it was Campbell who barricaded himself in his house to avoid arrest. Moreover, he was at all times free to terminate his conversation with Blair by hanging up the telephone and, if he chose, to speak with others. The crux of the Miranda rule as stated by the Supreme Court is "incommunicado interrogation of individuals in a police-dominated atmosphere." 384 U.S. at 445.
 
 
 23
 Aside from the absence of a custodial setting, Blair's phone call cannot be considered to be the "functional equivalent of interrogation." See Endress v. Dugger, 880 F.2d 1244, 1249 (11th Cir.1989), cert. denied, 495 U.S. 904 (1990). Blair called Campbell at the suggestion of a mutual friend who was concerned over Campbell's state of mind. Blair knew Campbell, having previously discussed Campbell's writings with him. At the time of the call, Blair was unaware of the activities of the United States Marshals at Campbell's home.
 
 
 24
 Thus, the tape recording of Campbell's statements to Blair was properly received into evidence.
 
 III. ADMISSION OF KDRV RECORDING
 
 25
 Campbell challenges the admission into evidence of a tape recording of statements made by Campbell to an unidentified male during the standoff. An unidentified man handed the tape to a reporter for a local television station, KDRV TV Medford, which aired excerpts as part of its news coverage of the standoff. The tape contained graphic threats by Campbell to kill a federal judge, federal prosecutor and United States marshals and their families. At the trial the reporter testified that he made a copy of the complete tape and returned the original to the owner. Campbell moved pre-trial to exclude the tape for lack of foundation and because the chain of custody was broken when the reporter gave the original tape to a production assistant to copy. He renewed the objection at trial and now argues that the district court erred in admitting the tape because the government failed to establish that it was "accurate, authentic and generally trustworthy."
 
 
 26
 "The admission of evidence is within the district court's discretion and reviewable under an abuse of discretion standard. The authentication of evidence is 'satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' Fed.R.Evid. 901(a)." United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir.), cert. denied, 502 U.S. 854 (1991). Authentication may be based on "contents [and] substance ... taken in conjunction with circumstances," Fed.R.Evid. 901(b)(4); moreover, testimony of voice recognition constitutes sufficient authentication. United States v. Torres, 908 F.2d 1417, 1425 (9th Cir.), cert. denied, 498 U.S. 905 (1990).
 
 
 27
 Detective Blair testified that he had listened to Campbell's voice on several occasions and that he recognized his voice on the KDRV tape. He stated that "[t]he tone of the voice is similar, the clip of his voice is similar, and the statements that he makes on the tape are very similar to the statements I had heard [in my conversation with him]." The contents of the KDRV tape, moreover, leaves no reasonable doubt that Campbell is speaking and is similar to what he said in his recorded conversation with Blair. See United States v. Miller, 771 F.2d 1219, 1234 (9th Cir.1985) (circumstances surrounding phone call from defendant were sufficient to authenticate testimony about his statements during the call). "[W]e have held that tapes are sufficiently authenticated under Fed.R.Evid. 901(a) if 'sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.' " United States v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir.1995) (quoting United States v. Black, 767 F.2d 1334, 1342 (9th Cir.), cert. denied, 474 U.S. 1022 (1985)).
 
 
 28
 Campbell's insistence on strict compliance with the requirement of proof of a chain of custody is unfounded. Since there is no reasonable doubt about the authenticity of the contents of the tape or about the accuracy of the recording of Campbell's statements as they appear on the tape, there is no basis for fearing that the tape had been altered, much less altered in any material respect. Moreover, Walt Maciborski, the KDRV reporter, testified that the tape in evidence was "a copy of the entire contents of the tape" he had received from the unknown male. Tapes may be admitted "if there is a reasonable probability the tapes have not been changed in important respects.... [A] defect in the chain of custody goes to the weight, not the admissibility, of the evidence introduced." Id. at 768-69 (citations omitted). Under all of the circumstances, we cannot say that the district court abused its discretion in admitting the tapes into evidence.
 
 IV. POINTS RAISED BY CAMPBELL PRO SE
 
 29
 Campbell also filed a lengthy pro se brief in which he raises numerous points. We have considered all of the points and, to the extent that they are not discussed below, reject them as without merit.
 
 A. Book Excerpt and Prior Bad Acts
 
 30
 Campbell argues in his supplemental brief that the court erred by admitting into evidence a one-page excerpt from his book Silent Tools of Justice, a prior incident involving law enforcement officers, and a 1989 assault conviction in Idaho. The district court ruled that the first two were relevant to proving Campbell's intent. Specifically, the excerpt from the book contained a threat to kill the next police officer who attempted to arrest Campbell by "putting a bullet between his eyes." The district court gave a limiting instruction that the statement was only to be considered in determining Campbell's intent. The court's decision to admit the evidence was not an abuse of discretion.
 
 
 31
 Likewise, the so-called "Fillmore incident" was probative of intent and its admission not an abuse of discretion. This evidence showed that in 1992, a deputy attempted to serve Campbell with a restraining order. Campbell displayed two .45 caliber handguns, accepted the papers, and warned the deputy that he would have "dropped him" if the deputy were trying to arrest him. As the government correctly argued, this was properly admissible to prove intent because the incident was sufficiently proved, not remote in time, involved conduct similar to that at issue in the present case, and probative of an essential element of the offense--i.e., that Campbell was serious in his threat to assault or murder a law enforcement officer. See United States v. Houser, 929 F.2d 1369, 1373 (9th Cir.1990).
 
 
 32
 The 1989 Idaho conviction for simple assault was received without objection after Campbell opened the subject during his redirect. When no objection is raised, we review for plain error. United States v. Khan, 993 F.2d 1368, 1376 (9th Cir.1993). We find none here.
 
 B. Other Points
 
 33
 The points raised fall generally into three categories, those attacking the indictment, those alleging perjury, and those attacking the judge's rulings.
 
 1. Indictment
 
 34
 Campbell argues that the indictment was insufficient because it was not signed by the Grand Jury Foreman. This is incorrect. Campbell also argues that the indictment is duplicitous because it charged in the disjunctive. In United States v. Mal, 942 F.2d 682, 686-87 (9th Cir.1991), a tax evasion case, this Court approved this method of charging when the alleged statutory violation can be committed by either of two alternative acts. The same reasoning applies here.
 
 
 35
 Campbell also argues that the indictment did not name the victims of the crime, but offers no authority for the proposition that the victims must be specifically named. In any case, the indictment does name the federal officer and states that a federal judge in Sacramento was also threatened. Finally, Campbell argues that the indictment was impermissibly altered when the court changed the word "murdered" to "killed" in the fact section referencing the "Randy Weaver incident" in Idaho. This alteration did not charge a different offense or affect the substantial rights of the defendant. See United States v. Perez, 776 F.2d 797, 799 (9th Cir.1985).
 
 2. Retaliation issue
 
 36
 Campbell complains that the government, in its opening statement, incorrectly described the charge against him as making threats in retaliation for the agents' performing their duties. It is true that Campbell was charged under subsection (a) of section 115 which makes threats unlawful if made with intent to impede, intimidate or interfere with employees performing their official functions. He was not charged under subsection (b) which makes such threats unlawful if made with intent to retaliate. Upon objection from counsel, the court promptly corrected the misstatement, and later correctly instructed the jury with respect to the elements of the offense. Any error, therefore, was harmless.
 
 3. Perjury
 
 37
 Campbell complains of numerous instances of alleged perjury and subornation of perjury. Most of the instances involve claimed inconsistencies in Detective Barr's testimony regarding where he found certain of the weapons in Campbell's home. These inconsistencies were brought to light during the trial and were explained as misstatements rather than intentional perjury. Barr was cross-examined extensively, the jury heard all of the evidence, and in the end convicted Campbell. The issue was raised again on a motion for new trial which was denied. Campbell's arguments are without merit.
 
 4. Trial decisions
 
 38
 Campbell argues the district court erred in denying a continuance motion, instructing the jury on the burden of proof regarding self-defense and reasonable doubt, denying a motion to sever, and sustaining an objection made during Campbell's closing arguments. He also argues he was provided ineffective assistance of counsel and was deprived of a unanimous jury verdict.
 
 
 39
 We review the district court's decision to deny a motion for continuance for abuse of discretion. United States v. Robinson, 967 F.2d 287, 291 (9th Cir.1992). Campbell argues that denial of his motion was prejudicial because he had just been assigned new counsel who had only a few weeks to prepare for the second trial. Because he was later acquitted on two of the six counts, he argues that had counsel been given more time, he would have been acquitted on all counts. However, one continuance had already been given. The decision to deny additional continuances was not an abuse of discretion.
 
 
 40
 Campbell argues that the denial of his motion to sever was prejudicial because it forced him to testify on all counts, not on counts one and two alone as he wished. The motion was made only four days before trial. Moreover, the joinder did not prejudice Campbell. The denial of the motion was not an abuse of discretion. United States v. Baker, 10 F.3d 1374, 1386 (9th Cir.1993), cert. denied, 115 S.Ct. 330 (1994).
 
 
 41
 Campbell argues the court's jury instruction shifted the burden to the defendant to prove he acted in self-defense rather than placing it on the government to prove that he did not so act. He also argues the court incorrectly defined "reasonable doubt." Both contentions lack merit. On self defense, the court instructed:
 
 
 42
 In addition to proving all the elements of the crime
 
 
 43
 beyond a reasonable doubt, the Government must also prove beyond a reasonable doubt either that the defendant did not reasonably believe a threat to assault or murder was necessary to defend against an immediate use of unlawful force, or that defendant stated a greater threat of force than appeared reasonably necessary in the circumstances. If the Government does not prove either of those elements, you must find defendant not guilty.
 
 
 44
 This instruction is consistent with the Ninth Circuit's model instruction on self-defense and is not erroneous. 9th Cir.Crim.Jury Instr. 6.05 comment (1992). The district court defined reasonable doubt as "a doubt based on reason and common sense, and may arise from a careful and impartial consideration of all the evidence or lack of evidence. Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty." See 9th Cir.Crim.Jury Instr. 3.03 (1992). Campbell has failed to show how this definition was deficient.
 
 
 45
 During closing argument, the government objected to defense counsel's discussing the language in a Supreme Court opinion. The trial court sustained the objection. Campbell has failed to show how the government's objection or the court's ruling resulted in error.
 
 
 46
 Campbell's ineffective assistance of counsel claim is meritless since it relates only to counsel's conduct during the first trial. Campbell had different counsel during the second trial and has made no charge that she was ineffective.
 
 
 47
 Finally, Campbell argues that he was deprived of a unanimous jury verdict because the "duplicity" of the indictment permitted some jurors to convict for threatening to assault a federal officer while others could convict for threatening to murder a federal officer. In United States v. Urrutia, 897 F.2d 430, 432 (9th Cir.), cert. denied, 495 U.S. 939 (1990), we stated that where a crime is defined disjunctively in a statute, it may be pled conjunctively and proof of any of those acts conjunctively pled may establish guilt. Further, the court instructed the jury that it had to "unanimously agree on the means by which defendant violated the statute." Therefore, Campbell's claim fails.
 
 V. UNITED STATES v. BAILEY
 
 48
 The government has called to our attention the Supreme Court's decision in United States v. Bailey, 116 S.Ct. 501, decided in December 1995, after all briefs in this court had been filed. As a general rule, we will not consider issues not raised in the trial court, but an exception exists where an issue arises because of a change in the law. See United States v. Whitten, 706 F.2d 1000, 1012 (9th Cir.1983), cert. denied, 465 U.S. 1100 (1984). We have interpreted Bailey as changing the rule in this circuit that possession of a gun is alone enough to support a conviction under 18 U.S.C. § 924(c)(1). United States v. Garcia, 77 F.3d 274, 276-77 (9th Cir.1996). Under Bailey, " 'use' [within the meaning of section 924(c)(1) ] denotes active employment." 116 S.Ct. at 509.
 
 
 49
 Section 924(c)(1) requires the imposition of specified penalties on a defendant who "during and in relation to any crime of violence ... uses or carries a firearm." 18 U.S.C. § 924(c)(1). The evidence establishes that when Campbell confronted the marshals who had come to his house to serve a summons, he "picked up ... [his] .45 [and] ... put it behind [his] back." The .45 was "locked, loaded, and ready to go." As the marshals left the property, one of them saw Campbell reach behind his back. Immediately thereafter, at the outset of the standoff, he went outside to his pickup truck and brought a gun and gunbag into the house. In his statement on the tape recording made that day, Campbell said: "I'm sitting here with uh three .45's on, and an AR-15 in my arms, with uh, uh, unique ammo in it ...," and "I am armed and I will not disarm, period, period...." This evidence is sufficient to support a finding of "active employment"; by his own admission, Campbell carried firearms in relation to threatening to assault or murder a law enforcement officer and he disclosed this fact so that it would become known to the objects of his threats. The jury, moreover, was properly instructed on the elements of the offense and further, that it had to find "beyond a reasonable doubt that the firearm was in the defendant's possession or under the defendant's control at the time that a crime of violence was committed, and the possession or control was an integral part of and facilitated the commission of the crime of violence. Mere possession of a firearm does not constitute use under the statute." We therefore find no error under Bailey.
 
 
 50
 AFFIRMED.
 
 
 
 *
 The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3