**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Jon Darrell STAUFFER, Defendant–Appellant.**

**No. 89–10581.**

United States Court of Appeals, Ninth Circuit.

Submitted Sept. 14, 1990 *.

Decided Dec. 21, 1990.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Meridith J. Watts, San Francisco, Cal., for defendant-appellant.

Matthew B. Pavone, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before FARRIS and THOMPSON, Circuit Judges, and MUECKE, District Judge.**

MUECKE, District Judge:

Jon Darrell Stauffer appeals his conviction for conspiracy to distribute drugs, interstate transporation in aid of a racketeering enterprise, and collection of extensions of credit by extortionate means. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant/Appellant, Jon Darrell Stauffer, was prosecuted as a peripheral participant in a drug ring headed by Richard Stuart Wallstrum. The Government charged Stauffer with four counts of an eight count indictment. Count One charged a conspiracy to possess with intent to distribute, and distribution of cocaine. 21 U.S.C. § 846 ("the drug distribution count"). Count Two charged a conspiracy to use extortionate means to collect an extension of credit from an individual in Hawaii. 18 U.S.C. § 894 ("the Hawaii extortion count"). Count Three charged travel in interstate commerce to carry out the charged Hawaii extortion scheme. 18 U.S.C. § 1952 ("the travel count"). Finally, Count Six charged a conspiracy to use extortionate means to collect an extension of credit from an individual in Nevada. 18 U.S.C. § 894 ("the Nevada extortion count").

The basis for the interstate travel charge contained in Count Three stems from Wallstrum having hired Stauffer and Stauffer's brother to travel to Hawaii to locate a man named Kevin Heinold. Wallstrum had loaned money (money derived primarily from drug trafficking) to Heinold. Wallstrum wanted the money back, but he could not find Heinold. Wallstrum selected the Stauffers because he felt they would be discreet about his drug trafficking activities. The brothers traveled to Hawaii to find Kevin. During their unannounced visit to Heinold's mother's house, Stauffer's brother said they were not there to hurt her son; they just wanted to talk to him about the missing money. Despite this comment, Mrs. Heinold had the impression that the Stauffers had bad intentions. A few days later Stauffer's brother returned and made threatening remarks to Mrs. Heinold about what would happen to her and her son if Kevin did not return the money.

After leaving Hawaii, Stauffer attempted to collect another debt in Nevada from a different individual. This undertaking led to the extortion charge contained in Count Six. Wallstrum had loaned approximately $5,000–10,000 of his drug proceeds to Anthony Fiori. Fiori was initially to invest the money with Charles Leonard in a sports gambling bar in Carson City. Sometime later, however, Fiori decided to back out of the investment and he asked for the money back. Fiori apparently gave Leonard some time to pay. Leonard made three installment payments, but then stopped paying. Wallstrum and Fiori arranged to have Stauffer try to get the rest of the money back. Stauffer confronted Leonard at Leonard's place of work, again unannounced, and threatened Leonard and Leonard's family over the repayment of the money.

In addition to the activities mentioned above, the following evidence relates to the charge of conspiracy to distribute drugs contained in Count One. On two or three occasions, Stauffer drove from Santa Cruz to Santa Rosa where he met his brother. Then, Stauffer and his brother met

** Honorable C.A. Muecke, Senior United States District Judge for the District of Arizona, sitting by designation.

Wallstrum alone in a car, and Wallstrum distributed cocaine directly to Stauffer's brother. Later, Stauffer delivered money to Wallstrum in payment for the cocaine previously "fronted" by Wallstrum in the automobile. When his brother left town, Stauffer told Wallstrum to contact him if Wallstrum needed anything.

Beginning on June 5, 1989, Stauffer was tried in a three day jury trial before the Honorable William W. Schwarzer, U.S. District Court for the Northern District of California. On June 7, 1989, the jury returned its verdict.

The verdict form reflected convictions on the drug distribution conspiracy, Hawaii extortion, and travel counts, and an acquittal on the Nevada extortion count. Post-verdict interviews of several jurors, initiated by Stauffer's counsel, determined that the jury had made a clerical error. The jury apparently became confused concerning the numbering of the counts on their copy of the superseding indictment. They had intended to acquit on the Hawaii extortion count, and convict on the Nevada extortion count. The trial court solicited affidavits from the jurors. All the jurors attested to the clerical error.

At a final post-trial hearing on November 9, 1989 the District Court switched the verdicts on the two extortion counts to correct the jury's mistake and denied Stauffer's post-trial motions concerning the sufficiency of the evidence on the drug distribution and travel counts. Judgment was entered accordingly and Stauffer received a sentence of five years in prison (Counts One and Six running concurrently), followed by five years of probation (Count Three).

On appeal, Stauffer argues that the Government presented insufficient evidence to support his convictions for conspiracy to distribute drugs (Count One), and for interstate travel from California to Hawaii for the purpose of carrying out extortion (Count Three). On Count Six (Nevada extortion), Stauffer argues that the Government failed to prove an essential element of the crime, i.e., an "extension of credit," and that judgment on Count Six violates his right against being placed in double jeopardy.

## DISCUSSION

I. *Whether a Demand, after Money has Changed Hands, for Return of the Money and Deferral of Repayment, is Sufficient to Establish an "Extension of Credit" Pursuant to 28 U.S.C. § 891(1) and § 894 for Purposes of Proving the Nevada Extortion Count.*

A. Standard of Review

■ Stauffer did not make a motion for acquittal directed to the Nevada extortion count at the close of the evidence. Therefore, he has waived any claim for reversal based on insufficiency of the evidence. The court's review of this issue is proper only to avoid a manifest miscarriage of justice or plain error. *United States v. Mora,* 876 F.2d 76, 77 (9th Cir.1989).

B. "Extension of Credit"

Stauffer was convicted under 18 U.S.C. § 894(a)[1] for conspiracy to use extortionate means to collect an extension of credit. Stauffer contends that the financial transaction between Anthony Fiori and Charles Leonard did not constitute an "extension of credit."

Title 18 U.S.C. § 891(1) defines an extension of credit:

> To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of a debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

---

**1.** Title 18 U.S.C. § 894(a) provides as follows:
  (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
    (1) to collect or attempt to collect any extension of credit, or

  (2) to punish any person for the non-repayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years or both.
  Both of the extortion counts in the indictment were charged under this section.

In addition, § 891(6) defines an extortionate extension of credit as "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failing to make repayment could result in the use of violence or other criminal means to cause harm to the person...." In drafting the Extortionate Credit Transaction legislation, Congress intended to recognize "a criminal offense to collect an indebtedness by extortionate means, regardless of how the indebtedness arose." Conf.Rep. No. 1397, 90th Cong., 2d. Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 1962, 2028. The legislative history is clear that Congress created this statute as "a weapon to be used with vigor and imagination...." *Id.* at 2029.

■ Courts have consistently recognized Congressional intent that the extortionate credit statutes be broadly interpreted to encompass many types of "credit extensions" besides traditional loans.[2] For example, in *United States v. Bonanno*, 467 F.2d 14 (9th Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973), a drug smuggler had been given $5000.00 up front to purchase drugs for his partner. However, the venture went awry when the drugs were lost while being flown in from Mexico. When the partner made threats in an effort to regain his "investment," the Ninth Circuit determined that "[these] activities were clearly within the ambit of the Act's proscriptions and it would be inconsistent with the spirit of the Act to find otherwise." *Id.* at 16–17.

Similarly, in *United States v. Andrino*, 501 F.2d 1373 (9th Cir.1974), the defendant made demands for repayment after individuals playing cards had incurred large debts. *Id.* at 1375–76. Again, the Ninth Circuit read the statute broadly, upholding the conviction even though the transactions lacked the typical formalities of standard loans, such as specified interest rates and their myriad other legal characteristics. *Id.* at 1377.

Stauffer admits that the definition given to "extension of credit" is very broad. Nevertheless, he argues that the evidence presented at trial does not fall within the broad definition. Stauffer relies on *United States v. Polizi*, 801 F.2d 1543 (9th Cir. 1986), a case where one of the defendants claimed that no extension of credit had been made to a Mr. Hall, because Hall had defrauded defendant into making the loan. This Court stated that whether the transaction in question involved "a simple loan, an investment in an illegal scheme, or outright embezzlement, there was an extension of credit as long as there was at least a tacit agreement to defer repayment." *Id.* at 1557. According to Stauffer, proof concerning a tacit agreement is lacking in the instant case; the evidence presented at trial suggests that Anthony Fiori gave money to Charles Leonard for investment purposes rather than a loan. Thus, Stauffer argues, the Government failed to establish an extension of credit.[3]

■ The *Bonanno* and *Andrino* cases clearly support the existence of an extension of credit in the instant case. The demand for repayment in the instant case, as in *Bonanno* and *Andrino*, occurred after the money initially changed hands. Although Leonard and Fiori testified that the transfer was good faith money in connection with a real estate investment deal, the jury could easily have concluded from the

---

**2.** *See United States v. Lopez*, 803 F.2d 969, 974–75 (9th Cir.1986), *cert. denied,* 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987) (defendant, who agreed to accept bad checks and hold them until sufficient funds were deposited, extended credit pursuant to the statute); *United States v. DiPasquale*, 740 F.2d 1282, 1287 (3rd Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985) (organized crime defendants' use of torture in an effort to coerce payments compelled the court to determine that "an agreement to defer the repayment of a debt may be implied from the debt, even if the debt is wholly fictitious"); *United States v. Totaro*, 550 F.2d 957, 958 (4th Cir.), *cert. denied,* 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977) (when the defendant tried to recover a check that the bank would not honor, court found the check to be an extension of credit).

**3.** A Third Circuit opinion suggests that if funds have been provided for investment purposes—rather than as a loan—no credit is extended. *See United States v. Giampa*, 758 F.2d 928, 933 (3rd Cir.1985).

evidence presented that this was no ordinary real estate transaction. When Fiori gave the money to Leonard, he delivered it in a paper bag. Moreover, after the request for repayment, Leonard made three installments. It was not until Leonard stopped making payments that Stauffer confronted him. Even though Leonard's testimony suggests that he did not view the money he received from Fiori as a loan, there is sufficient evidence for the jury to infer an agreement. In short, the evidence supports a finding that an extension of credit occurred. Therefore, this Court concludes that no miscarriage of justice or plain error occurred when the jury found Stauffer guilty on the Nevada extortion count (Count Six).

## II. Whether a District Court's Correction of a Verdict by Switching it from Acquittal to Guilty to Correct a Clerical Error made by the Jury on the Verdict Form Violates the Double Jeopardy Clause.

### A. Standard of Review

Whether the District Court's correction of the verdict form violates the double jeopardy clause is reviewed *de novo* by this Court. *United States v. Schwartz*, 785 F.2d 673, 676 (9th Cir.), *cert. denied*, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986).

### B. Scope of Double Jeopardy

In *United States v. Sanders*, 591 F.2d 1293 (9th Cir.1979), this Court stated that "jeopardy attaches when the jury is empaneled and sworn." *Id.* at 1296, quoting *Crist v. Bretz*, 437 U.S. 28, 29, 98 S.Ct. 2156, 2157, 57 L.Ed.2d 24 (1978). At that point, the defendant has a "valued right to have his trial completed by a particular tribunal." [citation omitted] *Id.* Double jeopardy protection however has its limits.

In *Brown v. Gunter*, 562 F.2d 122 (1st Cir.1977), the court stated that "the defendant's interest is not the only one at stake. We must also consider 'the societal interest in punishing one whose guilt is clear after he has obtained [a fair] trial.'" *Id.* at 125. Several similar cases from other circuits are in accord.[4]

Stauffer argues that though the district court acted properly in switching the guilty verdict to acquittal on the Hawaii extortion count (Count Two) to reflect the jury's true intent, it was a violation of the double jeopardy clause to switch the acquittal to guilty on the Nevada extortion count (Count Six). Stauffer argues that the first jeopardy concluded when the jury left the courtroom, and the district court should not thereafter be allowed to reinstate a guilty verdict over a jury acquittal, no matter how egregious the jury's error. Allowing the district court to take such action, according to Stauffer, would do violence to the historical notion of jeopardy in a jury trial by leaving it open in a post-verdict, prejudgment limbo. Stauffer argues that remaining true to the nature and purpose of the double jeopardy clause requires that protection arise after the defendant has experienced a trial, the verdict has been read, and the jury discharged, as happened here.

### C. Verdict Modifications

There is case law supporting correction of judgments to reflect the intent of jurors. In *United States v. Dotson*, 817 F.2d 1127 (5th Cir.), *modified on other grounds*, 821 F.2d 1034 (5th Cir.1987), the jury returned a verdict convicting the defendant on all ten counts. After the jury was dismissed, two jurors phoned the judge to tell him that the jury actually voted to acquit on the tenth count. After confirming the jurors' disclosure, the district judge changed the verdict to reflect acquittal on the tenth

---

4. *See United States v. Mears*, 614 F.2d 1175, 1179 (8th Cir.), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980) (affirming the district court's decision allowing the jury to change its verdict to "guilty" after the foreman declared in open court that the verdict form stating "not guilty" was incorrectly signed); *United States v. Love*, 597 F.2d 81, 85–87 (6th Cir.1979) (jury verdict changed after polling); *Shiflett v. Welch*, 161 F.2d 933 (4th Cir.), *cert. denied*, 332 U.S. 777, 68 S.Ct. 41, 92 L.Ed. 362 (1947) (after discharging the jury, the court corrected a mistakenly announced verdict of "not guilty" by changing it to "guilty" when it was shown that the jury had confused two counts in the indictment).

count. The Fifth Circuit affirmed, concluding that the district court's action was a permissible exception to the general prohibition against inquiry into the validity of a jury's verdict found in Rule 606(b) of the Federal Rules of Evidence. *Id.* at 1130.

The prior Ninth Circuit case most similar to the instant case is *United States v. Anzalone*, 886 F.2d 229 (9th Cir.1989). In *Anzalone*, the jury returned a verdict of acquittal on several counts of the indictment. However, when the jury was polled, one juror could not state that the verdict was her own. The judge sent the jury back for further deliberations but a unanimous verdict could not be reached. A mistrial was declared and the defendant was later retried on the same charges. This Court declared that defendant's subsequent conviction on one of the counts that was previously announced not guilty did not violate the double jeopardy clause. The *Anzalone* court cited a prior Ninth Circuit case, *United States v. Nelson*, 692 F.2d 83 (9th Cir. 1982), that addressed the question of when a jury verdict becomes valid. In *Nelson*, this Court indicated that the jury's task is complete when deliberations are finished, "the result is announced in open court, and no dissent by a juror is registered." *Id.* at 84–85, quoting *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir.1975).

■■■ In the instant case, the jury was discharged before the judge corrected the verdicts. While this Court might seem to be going further than *Anzalone* and *Nelson* if it affirms the district court's switch, such a ruling appears appropriate. Rule 36 of the Federal Rules of Criminal Procedure provides:

> Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the Court at any time and after such notice, if any, as the court orders.

The district court did not alter the jury's verdict itself; it simply corrected the ver-

dict form to reflect the jury's true intent. Clearly, decreasing the impact of a judgment is less problematic to a defendant than expanding its impact. Still, this Court is convinced that no possible unfairness can be found in a judgment that reflects the jury's true intent.[5] Despite Stauffer's admirable effort to persuade this Court that his right to be free from double jeopardy has been violated, the facts do not support a conclusion that the double jeopardy clause has been compromised in this case.

### III. *Whether the Verdicts of Guilty on the Conspiracy to Distribute Drugs Count (Count One) and the Travel Count (Count Three) are Supported by Sufficient Evidence.*

#### A. Standard of Review

■■■ There is sufficient evidence to support a conviction if any rational trier of fact, after viewing the evidence in the light most favorable to the government, could have found the defendant guilty beyond a reasonable doubt of each essential element of the crime charged. *See United States v. Linn*, 880 F.2d 209, 215 (9th Cir.1989); *United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989). "[C]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned. *United States v. Kelly*, 527 F.2d 961, 965 (9th Cir.1976). However, mere suspicion or speculation does not rise to the level of sufficient evidence. *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.1986).

#### B. Count I: Conspiracy to Possess with Intent to Distribute

■■■ Stauffer does not dispute that his brother, Wallstrum, and Fiori, among others, were involved in a drug distribution conspiracy.[6] Once the existence of a con-

---

5. Stauffer took no exception to the method used by the district court to determine the true intention of the jury; in fact, his trial counsel suggested it and carried it out.

6. The elements of such a conspiracy are:
1) an agreement to accomplish an illegal objective, 2) coupled with one or more acts in furtherance of the illegal purpose, and 3) the

spiracy is proved, evidence establishing beyond a reasonable doubt defendant's connection with the conspiracy, even though the connection is "slight," is sufficient to convict defendant of knowing participation in the conspiracy.[7] *Penagos*, 823 F.2d at 348.

Stauffer attempts to compare the instant case to *Penagos*, a case where an innocent bystander avoided conviction in a drug distribution conspiracy. The *Penagos* court determined that the government failed to prove its case because defendant's behavior was perfectly consistent with that of one having no stake or interest in the drug transaction and he did not even know contraband was present.[8]

■ The evidence at trial established that Wallstrum distributed cocaine on more than one occasion directly to Stauffer's brother—in Stauffer's presence—while the three men sat alone in a car. In his own testimony, Stauffer admitted to knowing that the envelopes given to the his brother contained cocaine. Stauffer's coordinated actions (i.e., meeting his brother, driving from Santa Cruz to Santa Rosa, and meeting Wallstrum) are circumstantial evidence suggesting that he was acting to further the conspiracy. Also, there was evidence that Stauffer delivered currency to Wallstrum in payment for the cocaine previously "fronted" by Wallstrum in the automobile. In addition, the jury could have concluded that Stauffer's threats to retrieve the money Fiori gave Mr. Leonard in Nevada were connected with the conspiracy. The record shows that when Stauffer attempted to collect this debt, Stauffer knew that Wallstrum's primary source of income was drug trafficking and that all or part of the money he was collecting belonged to Wallstrum.

Under these circumstances, viewing the evidence in favor of the government, the evidence appears to be sufficient to support the jury's conviction of Stauffer on the drug conspiracy count. Further, the implausibility of defendant's testimony that he was uninvolved in the drug transaction between his brother and Wallstrum and that he was uninvolved in extortion-type activities supports the jury's verdict. Stauffer's implausible testimony provides a basis for the jury to conclude that the opposite of his testimony is true. *United States v. Martinez*, 514 F.2d 334, 341 (9th Cir.1975) (jury's disbelief of a defendant's testimony can provide a partial basis for its conclusion that the opposite is true when other objective evidence buttresses drawing the inference).

### C. Count III: Interstate Travel for the Purpose of Carrying Out Extortion

According to Stauffer, the evidence indicates that he is guilty of nothing more than having the bad taste to hang around with his brother, and taking advantage of a chance to go to Hawaii at Wallstrum's expense; thus, Stauffer argues, the government failed to prove its case.

■ Despite Stauffer's contention, the evidence establishes that Stauffer and his brother were hired by Wallstrum to travel to Hawaii to locate Heinold and help Wallstrum get his money back. Though Wallstrum apparently indicated that no direct threats or actual violence were to be used, the Stauffers were selected by Wallstrum because he believed they would be discreet about his involvement with drugs. Furthermore, Stauffer's threats against Leonard in Nevada coupled with the evidence that Stauffer's brother threatened Mrs. Heinold during a second visit,

---

requisite intent necessary to commit the underlying substantive offense.
*United States v. Penagos*, 823 F.2d 346, 348 (9th Cir.1989).

**7.** The use of the word "slight" in this context has been the source of confusion. Mere proximity to the scene of illicit activity is not sufficient to establish involvement in the conspiracy, although presence may support such an inference when viewed in context with other evidence.

*Penagos*, 823 F.2d at 348; *see also United States v. Esparza*, 876 F.2d 1390, 1392 (9th Cir.1989) ("the word 'slight' properly modifies 'connection' and not 'evidence.' It is tied to that which is proved, not to the type of evidence or the burden of proof").

**8.** *See Hernandez*, 876 F.2d at 779–80 (government has burden to show more than mere presence).

are powerful circumstantial evidence that the two went to Hawaii as a team planning to intimidate Mrs. Heinold into giving information that would lead to repayment of Wallstrum's money. In short, the evidence was sufficient to sustain defendant's conviction on Count Three.

IV. *Whether it was Clearly Erroneous for the District Court to Deny Defendant's Motions for Judgment of Acquittal on Counts One and Three on the Ground that they were Untimely.*

Stauffer argues that the District Court abused its discretion when it based, in part, its denial of defendant's motions for judgment of acquittal as to Counts One and Three on the ground that the motions were untimely.

A. Standard of Review

The District Court's denial of defendant's motions for being, among other things, untimely involved a factual finding. Factual findings are reviewed under the deferential, clearly erroneous standard. *United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.) (*en banc*), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

B. Whether the District Court's Decision was Clearly Erroneous.

▮ The trial transcript in this case shows that, at the end of the presentation of evidence, Stauffer's trial counsel discussed motions for acquittal based on insufficiency of the evidence as to the drug conspiracy and travel counts.[9] Stauffer, thus, argues that the trial court's ruling denying the post-trial motions, in part, for the reason that they were untimely, should be reversed.

Even if the District Court was wrong to conclude that the motions were untimely, the District Court did not deny Stauffer's post-trial motions solely on the basis of untimeliness. The District Court also indicated that there was sufficient evidence to

support the verdicts on Counts One and Three. As discussed in prior sections of this opinion, there was sufficient evidence to support the verdicts.

▮ When a district court lists several reasons for taking a certain action, and one of the reasons is flawed, the district court's decision should still be upheld if other reasons support the ruling. In short, the District Court's decision denying defendant's motions was not clearly erroneous.

CONCLUSION

AFFIRMED.

FARRIS, Circuit Judge, concurring:

I concur in the result reached by the majority opinion.

---

9. Stauffer indicated that the official transcript is garbled as to exactly what was stated. Stauffer's appellate counsel attempted, but was unable, to contact the court reporter in order to obtain a more precise understanding of what was said.