19 F.3d 32
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Antonio VARGAS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Audel Ceja BERDUZCO, Defendant-Appellant.
 Nos. 91-50506, 91-50514.*
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 5, 1993.
Decided Feb. 15, 1994.
 
 1
 Before: REINHARDT and T.G. NELSON, Circuit Judges, and KAUFMAN, Senior District Judge.***
 
 
 2
 MEMORANDUM****
 
 INTRODUCTION
 
 3
 On September 28, 1990, a federal grand jury in the Southern District of California returned a criminal indictment charging defendant-appellant Antonio Vargas and defendant-appellant Audel Ceja Berduzco with conspiracy to possess methamphetamine with intent to distribute ("Count 1") and possession of methamphetamine with intent to distribute ("Count 2"), in violation of 21 U.S.C. Secs. 846 and 841(a)(1). On January 10, 1991, the grand jury returned a superseding indictment, adding two gun counts against Ceja for possession of a firearm by a convicted felon and illegal alien (Counts 3 and 4), in violation of 18 U.S.C. Secs. 922(g) and 924(a). Vargas, a United States citizen with no prior criminal record, was not charged with Counts 3 or 4 relating to the firearms.
 
 
 4
 On February 27, 1991, the trial of Vargas and Ceja began before visiting U.S. District Judge John C. Coughenour. U.S. District Judge Judith N. Keep delivered the jury instructions. On March 4, 1991, the jury convicted Vargas of conspiracy (Count 1) and acquitted him of possession. Ceja was convicted of all counts. On May 21, 1991, Vargas was sentenced to 180 months in custody and five years of supervised release. Ceja received 360 months in custody and five years of supervised release.
 
 
 5
 Both Vargas and Ceja filed timely notices of appeal of their convictions. Ceja claims that U.S. District Judge Rudi M. Brewster, who conducted pre-trial motions in the within case, improperly admitted into evidence statements made by Ceja before he received Miranda warnings.[1] Both appellants assert that Judge Coughenour, who presided over their joint trial, improperly admitted into evidence the testimony of a cooperating witness, and that there is insufficient evidence to support their convictions. Finally, both appellants argue that the failure of Judge Keep to instruct the jury sua sponte regarding the Second Amendment right to bear arms constituted reversible error.
 
 
 6
 We affirm the district court's actions in all respects. Ceja was not in custody at the time of his statements to the police, rendering any Miranda warning unnecessary. The testimony of the cooperating witness, Scott Wentz, was admissible as direct evidence of a conspiracy engaged in by appellants, and the evidence was more than sufficient to support appellants' convictions. Appellants' claim regarding the failure to instruct is without merit.
 
 FACTUAL BACKGROUND
 
 7
 Sometime before June 1990, Vargas and Ceja assumed residence in a duplex in Escondido, California. Neighbors immediately grew concerned over an increased flow of short-term traffic to the house. The two neighbors sharing the duplex building with appellants noticed what the neighbors perceived to be a guard stationed in front of the duplex and felt so intimidated by Vargas's and Ceja's behavior toward them that they vacated the duplex. Shortly after their departure, the remaining neighbors contacted the Escondido Police Department about the problem.
 
 
 8
 On September 24, 1990, based upon the neighbors' complaints, police officers visited the home of appellants. Vargas answered the door and, when told by the officers of the purpose of their visit, allowed them to search the premises. Ceja, also present, likewise consented. The officers discovered in Vargas's bedroom closet a loaded handgun inside a jacket pocket. Vargas denied ownership or knowledge of the gun, speculating that it might belong to another, unidentified person who he claimed sometimes shared the bedroom and half of the closet with Vargas. In Ceja's room and in the living room, the officers found more loaded firearms. Detective Martinez, one of the officers on the scene, investigated and discovered that the firearm in Ceja's bedroom was stolen, but the detective did not inform Ceja that he knew this. No drugs were found in the house.
 
 
 9
 Outside the home, the officers noticed a truck and a Corvette parked in the driveway. Vargas consented to a search of the truck, though he stated that it belonged to a friend. However, he refused to allow a search of the car, claiming that it also did not belong to him and had been dropped off earlier that day by a man he knew only as "Jose."
 
 
 10
 Detective Martinez then re-entered the house and asked Ceja who had control of the Corvette. Ceja asserted that he had control of the Corvette, but that it belonged to a friend whom Ceja knew only as "Juan." Ceja further stated that he had driven the car from Las Vegas on the previous night in order to perform some repairs. At first, Ceja stated that the car was locked and that he could not find the keys. Upon being informed by Martinez that he had ascertained that the car was not locked, Ceja permitted the officers to search the Corvette.[2] Ceja directed the officer's attention to the rear of the car and informed Martinez of the location of the latch to open the back hatch. Inside the car, beneath or beside the front passenger seat, the officer found a large plastic bag which contained fifteen one-pound bags of methamphetamine.
 
 
 11
 During the search, Scott Wentz arrived at the house, carrying $31,500 in cash and a small scale in the trunk of his car. After questioning, Wentz admitted that he had come to the house to purchase methamphetamine. By the date of trial, Wentz, after being arrested on other, unrelated charges, agreed to testify as a cooperating witness for the government.
 
 
 12
 At trial, Wentz testified that he had purchased multiple pounds of methamphetamine from Ceja every week since 1989. The transactions generally involved Wentz telephoning Ceja with his request and driving to the location specified by Ceja as the delivery point. Wentz then would deliver payment for the drugs and wait for the methamphetamine to arrive. Most of the transactions occurred in one of Ceja's various homes. Wentz testified that appellant Vargas occasionally was present during these transactions. He also recalled one occasion when he met Vargas, gave him the money required, drove with Vargas to another location, and waited while Vargas obtained the drugs and provided them to him. Wentz testified that he believed Ceja and others were working together as an organization because it did not matter to whom Wentz paid the money or from whom he received the drugs.
 
 
 13
 Neither Vargas nor Ceja moved for a judgment of acquittal based on insufficient evidence during or after trial. Likewise, neither appellant requested any instruction pertaining to the firearms found in the house.
 
 DISCUSSION
 A. Ceja's Statements Regarding the Corvette
 
 14
 Appellant Ceja contends that the admission into evidence of statements he made regarding the ownership and control of the Corvette in response to questions by Detective Martinez violated his Miranda rights and should have been excluded. He further alleges that the failure of Judge Brewster to suppress the statements constitutes reversible error.
 
 1. Standard of Review
 
 15
 The Supreme Court in Miranda, 384 U.S. at 444, required that a person be advised of certain constitutional rights prior to a "custodial interrogation" by law-enforcement authorities. A determination of whether a defendant "was subjected to custodial interrogation is a factual determination that must be made on a case-by-case basis." United States v. Crisco, 725 F.2d 1228, 1230 (9th Cir.1984), cert. denied, 466 U.S. 977 (1984). Accordingly, a determination as to whether a defendant was in custody is examined for clear error. United States v. Gregory, 891 F.2d 732, 735 (9th Cir.1989); United States v. Hudgens, 798 F.2d 1234, 1236 (9th Cir.1986); United States v. Booth, 669 F.2d 1231, 1236 (9th Cir.1981).
 
 
 16
 If the district court makes no explicit finding with respect to the question of custody, we may conduct, if necessary, an independent examination of the facts, findings, and record. See United States v. Brady, 819 F.2d 884, 887 (9th Cir.1987), cert. denied, 484 U.S. 1068 (1988). However, we may determine that the district court made implicit findings of fact if such findings were necessary to the court's disposition of a motion. See United States v. Kinsman, 540 F.2d 1017, 1019 (9th Cir.1976), withdrawn on other grounds, 573 F.2d 3 (9th Cir.1978). In such an event, the implicit findings are reviewed for clear error. See id.
 
 
 17
 For purposes of this decision, we will assume arguendo only that we are to conduct an independent examination of the record.
 
 2. Ceja Was Not in Custody
 
 18
 "Custody necessarily implies a degree of control" and is determined through an "objective reasonable person test" from the point of view of the person being interrogated. Crisco, 725 F.2d at 1231. Custody may exist if "a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." United States v. Eide, 875 F.2d 1429, 1437 (9th Cir.1989) (quoting United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir.1985). Custody is defined as "formal arrest or a restraint on freedom of movement of the degree associated with formal arrest." Id. (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Five factors are considered in deciding if a defendant was in custody at the time of questioning. These are:
 
 
 19
 [t]he language used ... in summoning the [defendant], ... [t]he physical characteristics of the place where the interrogation occurred, ... [t]he degree of pressure applied to detain the [defendant], ... [t]he duration of the detention, ... [and] [t]he extent to which the [defendant] [is] confronted with evidence of his guilt.
 
 
 20
 Hudgens, 798 F.2d at 1236; see also Gregory, 891 F.2d at 735; Crisco, 725 F.2d at 1231; Booth, 669 F.2d at 1235. The inquiry is conducted in light of the "totality of circumstances." Hudgens, 798 F.2d at 1236.
 
 
 21
 Ceja was advised at the beginning of the police search of his home that he and the other occupants were free to leave. Though Detective Martinez admitted upon cross-examination that, after his discovery of a stolen firearm in Ceja's bedroom, he would not have permitted Ceja to leave, he never informed Ceja either that he knew the gun was stolen or that he no longer would allow Ceja to leave. A reasonable innocent person would seem to have had no reason to believe that Martinez's original instruction was no longer in force.[3] Furthermore, the fact that, upon ascertaining that the gun was stolen, Martinez possessed sufficient probable cause to arrest Ceja does not require that we determine that Ceja was in custody. See United States v. Manasen, 909 F.2d 1357, 1358 (9th Cir.1990); United States v. Woods, 720 F.2d 1022, 1030-31 (9th Cir.1983).
 
 
 22
 In looking at the physical surroundings of the interrogation, this circuit has indicated that the fact that an encounter occurs in the home of the defendant, or in comfortable, familiar surroundings, may militate against a determination of custody. See Gregory, 891 F.2d at 735; Eide, 875 F.2d at 1437; Crisco, 725 F.2d at 1231. But cf. United States v. Bekowies, 432 F.2d 8, 12 (9th Cir.1970) (even if questioning occurs in the home, it still can be custody, depending on the circumstances). In the instant case, Ceja was asked about the Corvette during the course of a consensual, daytime search of his home. At the time, relations with the officers appear to have remained outwardly amicable, see Eide, 875 F.2d at 1437, and Ceja was not outnumbered and alone, as four of his friends remained present.
 
 
 23
 The officers also seem to have exerted no physical pressure to detain Ceja prior to his arrest upon the discovery of the drugs. No guns had been drawn; no one had been handcuffed. Cf. Gregory, 891 F.2d at 735 (police initially drew guns, then re-holstered them prior to the interview, and the court concluded that there was not custody); Booth, 669 F.2d at 1236 (though district court determination of custody was not clearly erroneous, even "[h]andcuffing a suspect does not necessarily dictate a finding of custody").
 
 
 24
 Furthermore, there does not appear to have been psychological coercion rising to the level of custody. Martinez seems to have asked few direct questions of Ceja, merely attempting to ascertain who had control of the Corvette. Ceja does not appear to have attempted to leave the scene, and Martinez seems not to have browbeat, threatened or manipulated the defendant to coerce him to answer his questions. Cf. Eide, 875 F.2d at 1432 (the telling of a "parable" by one of two FBI agents in defendant's home, which was designed to induce feelings of remorse, did not establish custody). None of the officers appears to have informed Ceja that he or she knew the gun was stolen, and none of them seems to have known of Ceja's probation status.
 
 
 25
 That latter point relates to the final prong of the five-factor test, confrontation with evidence of guilt, as well. Apparently, at no time prior to the discovery of the methamphetamine in the Corvette did anyone confront Ceja or his friends with allegedly incriminating evidence.
 
 
 26
 Accordingly, we conclude that a reasonable innocent person would not have felt constrained within the definition of custody under the case-law. Ceja's statements regarding the Corvette were admissible, and the district court's determination in that regard was not erroneous.
 
 
 27
 B. The Testimony of Cooperating Witness Scott Wentz
 
 1. Standard of Review
 
 28
 We review de novo the question of whether the evidence at issue constituted direct evidence of the alleged conspiracy or " 'other crimes' evidence beyond the scope of the indictment and admissible only in limited circumstances under Fed.R.Evid. 404(b)." United States v. Mundi, 892 F.2d 817, 820 (9th Cir.1989), cert. denied, 498 U.S. 1119 (1991); see also United States v. Soliman, 813 F.2d 277, 278 (9th Cir.1987). Once the evidence has been classified as direct or as "other crimes" evidence, a trial court's decision to admit that evidence is reviewed for abuse of discretion. See Mundi, 892 F.2d at 820; Soliman, 813 F.2d at 278.
 
 
 29
 2. Wentz's Testimony Properly Was Admitted as Direct
 
 Evidence
 
 30
 Appellants claim that the testimony of cooperating witness Scott Wentz regarding the presence or participation of appellants during various drug transactions should have been excluded and that the admission of such evidence constituted reversible error. We conclude that Wentz's testimony properly was admitted as direct evidence of the crimes of which appellants were convicted.
 
 
 31
 The superseding indictment charges appellants, inter alia, with conspiring "to possess, with intent to distribute, 100 grams and more of methamphetamine." As appellant Vargas's attorney conceded during oral presentations,[4] this language encompasses more than simply the drugs found in the Corvette. The boilerplate language employed by the indictment merely alleges a general amount of the drug.[5] The superseding indictment, in its description of the conspiracy, states that "[b]eginning at a date unknown ... [the defendants] did knowingly and intentionally conspire with each other and with divers other persons known and unknown ... to possess, with intent to distribute, 100 grams and more of methamphetamine." In delineating specific "overt acts" in furtherance of the conspiracy, the indictment lists three of five acts which deal with "multi-pound quantities of methamphetamine" other than the 6.81 kilograms found in the Corvette on Sept. 24, 1990. It seems clear from the wording of the indictment, and the inclusion of the three aforementioned overt acts, that the indictment count relating to the conspiracy charge encompasses more than simply the drugs found in the Corvette. Thus, Wentz's testimony constitutes "direct evidence" of the conspiracy.
 
 
 32
 Evidence that is " 'inextricably intertwined' with, and 'part of the same transaction' as, the conduct alleged in the indictment" comprises direct evidence. Mundi, 892 F.2d at 820 (quoting Soliman, 813 F.2d at 279). In this case, testimony of Vargas's past involvement in drug transactions with Wentz and Ceja seems part and parcel of the conspiracy alleged by the government against him, while all of Wentz's extensive testimony relating to past drug deals with Ceja falls within the conspiracy count with regard to the latter.
 
 
 33
 While Vargas correctly contends that his mere presence at the scene of drug transactions and his association with drug traffickers cannot constitute evidence against him, proof of his presence can be "probative of [a] nexus [to the conspiracy] when viewed in the context of other evidence." United States v. Reese, 775 F.2d 1066, 1072 (9th Cir.1985). Additionally, once a conspiracy is established, evidence which proves beyond a reasonable doubt that Vargas was connected even slightly to the conspiracy is relevant in support of his conviction for participation in it. See United States v. Boone, 951 F.2d 1526, 1543 (9th Cir.1991). The evidence proffered by Wentz appears to meet the necessary criteria for relevance and for status as direct evidence in the case at bar.
 
 
 34
 For the above-stated reasons, we determine that Wentz's testimony was direct evidence and properly was admitted into evidence with regard to both appellants at trial.[6]
 
 C. Sufficiency of Evidence
 
 35
 Appellants argue that the sum of the evidence, irrespective of how this Court rules with regard to their other objections, is insufficient to support their convictions.
 
 1. Standard of Review
 
 36
 The Supreme Court in Jackson v. Virginia, 443 U.S. 307, 319 (1979), delineated the proper standard of review for a claim of insufficient evidence. The Court stated that, if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction stands. Id.; see also United States v. Penagos, 823 F.2d 346, 347 (9th Cir.1987). This circuit, in following that formulation, has emphasized the respect due "the jury's ability to judge the credibility of the witnesses, resolve factual conflicts, and draw inferences." United States v. Feldman, 853 F.2d 648, 654 (9th Cir.1988), cert. denied, 489 U.S. 1030 (1989).
 
 
 37
 This already formidable standard assumes even greater proportions when trial counsel has failed to preserve the issue by challenging the sufficiency of the evidence at trial, as is the situation in the case at bar. Under these conditions, the plain error doctrine applies, and an appellate court will review a claim only to prevent a "manifest miscarriage of justice." E.g., United States v. Reyes-Alvarado, 963 F.2d 1184, 1187 (9th Cir.1992), cert. denied, Gonzalez-Ramirez v. United States, 113 S.Ct. 258 (1992) (quoting United States v. Smith, 924 F.2d 889, 893-94 (9th Cir.1991)); United States v. Lai, 944 F.2d 1434, 1440 (9th Cir.1991), cert. denied, Brandon v. United States, 112 S.Ct. 947 (1992).
 
 
 38
 2. There Was Sufficient Evidence to Support the Convictions
 
 
 39
 We first will address the conspiracy count, under which both appellants were convicted. To establish a conspiracy the government must prove "an agreement to accomplish an illegal objective," the commission of one or more acts in furtherance of that objective, and "the requisite intent necessary to commit the underlying substantive offense." Penagos, 823 F.2d at 348; see also Smith, 924 F.2d at 894 n. 1. The act itself may be lawful, so long as it is executed in pursuit of the goals of the conspiracy, and it may be committed by a member of the conspiracy other than the defendant. See Braverman v. United States, 317 U.S. 49, 53 (1942). A participant in the conspiracy need know only the "essential nature of the plan and [his] connections with it, without requiring evidence of knowledge of all its details or of the participation of others." Blumenthal v. United States, 332 U.S. 539, 557 (1947).
 
 
 40
 Additionally, we must remain mindful that the jury may consider circumstantial evidence and inferences from that evidence. See United States v. Stauffer, 922 F.2d 508, 514 (9th Cir.1990).[7] "Even the uncorroborated testimony of an accomplice is enough to sustain a conviction unless it is incredible or unsubstantial on its face." Lai, 944 F.2d at 1440. Once a conspiracy has been proven, the prosecution must establish beyond a reasonable doubt merely a slight connection of the defendant to the conspiracy. See United States v. Lopez, 625 F.2d 889, 895 (9th Cir.1980); see also United States v. Cloughessy, 572 F.2d 190, 191 (9th Cir.1977).
 
 
 41
 The evidence in the instant case appears adequate to support both appellants' convictions. Vargas's behavior during the search of the Corvette by the police and his residence and activity at a suspected site of drug trafficking raise some questions as to his purported innocence. The testimony of Scott Wentz, an alleged eyewitness to several instances of Vargas's involvement with drug transactions, particularly one occasion when Vargas delivered the methamphetamine to Wentz and received payment, seems amply to satisfy the requirements set forth by the case-law. A rational jury, on these facts, could have decided to believe Wentz's testimony, even if uncorroborated.[8] The circumstances and results of the search of Vargas's home bolster the jury's finding of guilt.
 
 
 42
 The issue of sufficiency with regard to Ceja is even more clear. The bulk of Wentz's testimony concerned drug transactions with Ceja; if, as we have concluded, a rational jury could have convicted Vargas of conspiracy on the basis of Wentz's testimony, it surely also could have convicted Ceja on that basis. The discovery of the drugs in the Corvette, along with Ceja's admission of control over the car and his familiarity with its interior, further support his conviction for conspiracy and provide enough evidence, along with the testimony of Wentz, to ground his conviction for possession as well.[9] While the jury apparently believed Vargas's link with the car to be too tenuous to support a possession conviction, it evinced no such qualms with regard to Ceja. We will not gainsay that determination.
 
 D. Failure to Instruct
 1. Standard of Review
 
 43
 On appeal, appellant Vargas contends that the trial judge should have issued an instruction to the jury advising it of his purported constitutional right to own a firearm.[10] U.S. Const. amend. II. He did not request any such instruction during trial. When a party fails to object to jury instructions before jury deliberations begin, we must apply a "plain error" standard of review. E.g., United States v. Ward, 914 F.2d 1340, 1344 (9th Cir.1990). When a court applies a plain error standard, it will review only if the flaw alleged constitutes "a highly prejudicial error affecting substantial rights." Ward, 914 F.2d at 1344 (quoting United States v. Bustillo, 789 F.2d 1364, 1367 (9th Cir.1986)). A court will review to prevent a "manifest miscarriage of justice." Gilbert v. United States, 307 F.2d 322, 327 (9th Cir.1962), cert. denied, 372 U.S. 969 (1963).
 
 
 44
 Of course, the plain error standard "only goes to the issue of reviewability and not to the issue of whether a reversal is warranted." United States v. Lopez, 575 F.2d 681, 685 (9th Cir.1978). For example, the underlying error may be plain enough to warrant review but be so "harmless" as to lack justification for reversal. See id. In examining the adequacy of a jury instruction, or lack thereof, this court should look to "the adequacy of the entire charge ... in the context of the whole trial." Mundi, 892 F.2d at 818 (quoting United States v. Marabelles, 724 F.2d 1374, 1382 (9th Cir.1984)).
 
 2. Failure to Instruct Not Erroneous
 
 45
 Appellant cites no case authority with regard to whether exercise of one's alleged Second Amendment right to bear arms can or cannot be used as probative evidence when appropriate. Furthermore, Vargas claimed no knowledge or ownership of the gun in the first place. Consequently, had the court issued the type of instruction appellant now requests, such an action might have given rise to an appeal by Vargas complaining of the very thing which he now seeks. The requested instruction conceivably might have been viewed as undercutting Vargas's disclaimers.[11]
 
 
 46
 Even if the failure of the judge to instruct the jury regarding Vargas's right to own a handgun was erroneous, the mere "availability of a better instruction is not a ground for reversal." Ward, 914 F.2d at 1344. Vargas's attorney emphasized, and the prosecutor did not dispute, that Vargas disclaimed ownership of the gun and that no fingerprints or other connections between Vargas and the gun were established by the prosecution. Judge Keep, in her instructions to the jury, stated that it must "decide the case of each defendant on each crime charged against that defendant separately" and, in discussing each count individually, named only the defendant charged in that count. Nowhere in the judge's directions is Vargas linked with the gun charges.
 
 
 47
 No unfair prejudice within the meaning of Fed.R.Evid. 403 resulted from the lack of instruction in the case at bar. Unfair prejudice
 
 
 48
 results from an aspect of the evidence other than its tendency to make the existence of a material fact more or less probable, e.g., that aspect of the evidence which makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.
 
 Bailleaux, 685 F.2d at 1111.[12]
 
 49
 Even though Vargas seemingly had a right to possess a firearm, the fact that a gun was found in his bedroom was relevant to the issues at trial. The possible possession of a handgun by a person suspected of drug trafficking might shed light on that person's activities in the minds of the jury and does bear probative force, as a gun reasonably could be seen as a "tool of the trade" for a drug dealer. Simply because Vargas had a right to own a gun does not exclude an inference which legitimately can be drawn from the exercise of that right. See United States v. Gilley, 836 F.2d 1206, 1213-14 (9th Cir.1988), cert. denied, 109 S.Ct. 219 (1988). Moreover, the jury might have considered Vargas's contention that the gun belonged to someone else as so inherently implausible that, when coupled with the other, objective evidence, the exact opposite must have been the case. In turn, the jury then may have scrutinized Vargas's possible motive to lie. See Stauffer, 922 F.2d at 515.
 
 
 50
 Additionally, the substantial evidence in this case which is unfavorable to the defendant and wholly unrelated to the gun renders any error less harmful than is required by this circuit for reversal. See Lopez, 575 F.2d at 685. Reversal is not necessary in this case to prevent a "manifest miscarriage of justice." Gilbert, 307 F.2d at 327.
 
 
 51
 Accordingly, we conclude that the failure of the court below to issue a jury instruction, sua sponte, regarding defendant's right to own a firearm does not constitute reversible error.
 
 CONCLUSION
 
 52
 We hereby AFFIRM the convictions of appellants Audel Ceja Berduzco and Antonio Vargas and AFFIRM the judgments of the district court below in all respects.
 
 
 
 *
 No. 91-50514 was deemed appropriate for submission without oral argument. See 9th Cir.R. 34-4
 
 
 **
 The Honorable John C. Coughenour, United States District Judge for the Western District of Washington, sat in the lower court by designation
 
 
 ***
 The Honorable Frank A. Kaufman, Senior United States District Judge for the District of Maryland, sitting by designation
 
 
 ****
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Miranda v. Arizona, 384 U.S. 436, 444 (1966), requires that a person be advised of certain constitutional rights prior to a "custodial interrogation" by law-enforcement authorities
 
 
 [2]
 At the time, Ceja was serving the probationary term of a sentence which required as a condition of probation that he consent to a search of his property and person. The officers did not know of this fact at the time of the search
 The Corvette, which belonged to a person named Jose Amezcua, was reported stolen eight hours after appellants' arrest.
 
 
 [3]
 While Ceja probably was aware that the gun was stolen, and certainly was aware or should have been aware that possession of a gun violated the terms of his probation, at the time Martinez did not know of Ceja's probation status. See note 2, supra. A reasonable innocent person would have no cause to believe that the possession of a gun, in itself, would give rise to an arrest
 
 
 [4]
 Appellant Ceja waived right of oral presentation and submitted his claims on the briefs
 
 
 [5]
 At oral presentations, we expressed some confusion as to which version of two supplied to the Court was the proper superseding indictment. One version specified "approximately 6.81 kilograms" of methamphetamine, the exact amount found in the Corvette, and the other merely stated "100 grams and more." We asked counsel for the government and for appellant Vargas to look into the matter and appreciate their prompt responses. In view of those responses, and in the light of our own examination of the official district court clerk's record for the within case, we determine that the indictment containing the language "100 grams and more" is correct. That version is signed and docketed in the clerk's record; the other is not
 
 
 [6]
 Even if Wentz's testimony were to be considered as "other crimes" evidence with regard to one or both of appellants, we would still view its introduction into evidence as within the discretion of the trial judge. In a conspiracy case, "other crimes" evidence can be relevant if it reveals the "background and development of the conspiracy." United States v. McKoy, 771 F.2d 1207, 1214 (9th Cir.1985). Also, "[i]n conspiracy prosecutions, the Government has considerable leeway in offering evidence of other offenses" not charged in the indictment. United States v. Bonanno, 467 F.2d 14, 17 (9th Cir.1972), cert. denied, 410 U.S. 909 (1973); see also United States v. Bailleaux, 685 F.2d 1105, 1110-11 (9th Cir.1982). The trial court possesses discretion to determine if the probative value of the evidence at issue outweighs the likelihood of unfair prejudice to the defendant. See, e.g., Bailleaux, 685 F.2d at 1110
 
 
 [7]
 Of course, "mere suspicion or speculation does not rise to the level of sufficient evidence." Stauffer, 922 F.2d at 514
 
 
 [8]
 As the government has pointed out, Wentz's testimony actually was corroborated in many respects through the quantity of confirmable detail given by Wentz and through the testimony of others, such as appellants' neighbors, regarding some of appellants' more visible activities
 
 
 [9]
 "Count 2" of the Superseding Indictment, under which Ceja was convicted, alleged that "[o]n or about September 24, 1990, within the Southern District of California, defendants AUDEL CEJA BERDUZCO and ANTONIO VARGAS did knowingly and intentionally possess, with intent to distribute, 100 grams and more of methamphetamine."
 Though that count does not specify 6.81 kilograms, the amount of methamphetamine discovered in the Corvette, its restriction of the charge to on or about the date on which the drugs in the car were found implies that appellants were accused of possession of only those drugs. As we believe the evidence supports Ceja's conviction regardless of the breadth of that charge, we do not decide if the count so is restricted.
 
 
 [10]
 Ceja, in his brief to this Court, expressly adopted all of the arguments presented by co-appellant Vargas. However, as Ceja stipulated to the fact that he is an illegal alien and was a convicted felon on probation at the time of his arrest, he was forbidden to possess firearms under 18 U.S.C. Secs. 992(g)(1) and (5), and 924(a). For that reason, we will consider only Vargas's claim with regard to the supposed failure to instruct
 
 
 [11]
 In his brief, Vargas alludes to the failure of his trial counsel to object to the lack of instruction in language that implies attorney error. The tactical decision of an attorney not to object generally is not challenged by appellate courts absent a demonstrable claim of a Sixth Amendment violation. See, e.g., Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir.1981); Garrison v. McCarthy, 653 F.2d 374, 378 (9th Cir.1981). No such circumstance is present here
 
 
 [12]
 Though Vargas contends, with some validity, that the disclosure of the gun's presence in Vargas's bedroom created a potential risk of unfair prejudice, the record appears to reveal insufficient grounds for his concern that such risk actually unfolded. The prosecutor apparently made no egregious misuse of the gun's presence and even pointed out the inability of the government to tie the gun conclusively to Vargas, in the course of her attempt to bolster the credibility of Wentz. In any event, if real prejudice existed, Vargas's trial counsel should have brought it to the court's attention below, and defendant's current counsel should have specified valid examples of prosecutorial misconduct on appeal. We are not convinced by the latter's reference to the prosecutor's closing remarks that any prejudice arose in this case